**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**FOX HOLLOW OF TURLOCK OWNER'S ASSOCIATION, a California Nonprofit Mutual Benefit Corporation, et al.,**

**Plaintiffs**

**v.**

**MAUCTRST, LLC, et al.,**

**Defendants**

**CASE NO. 1:03-CV-5439 AWI SAB**

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**I. Procedural History**

1. The plaintiffs in this case are Fox Hollow of Turlock Owners' Association ("Fox Hollow HOA") and California Equity Management Group, Inc. ("CEMG").
2. The defendants in this case are Richard Sinclair, Brandon Sinclair, Lairtrust, LLC ("Lairtrust"), Capstone, LLC ("Capstone"), Mauctrst, LLC ("Mauctrst"), Gregory Mauchley and Stanley M. Flake (both personally and as trustee of the Julie Insurance Trust, the F. Hanse Trust, and the Capstone Trust, collectively "Flake Defendants").
3. This case is related to a state court case filed on April 24, 2003 in Stanislaus County Superior Court, Case No. 332233 ("State Court Action"). Parts of the present case were stayed pending final resolution of the State Court Action. The parties filed a notice of settlement on July 16, 2007. Doc. 303. However, in the State Court Action, it was determined that the settlement was unenforceable. The case was resolved in a bench trial. The ruling by the Superior Court was affirmed by the Fifth District Court of Appeal and the petition for review was denied by the California Supreme Court in 2013.
4. The operative complaint in this case is the Consolidated Amended and Supplemental Complaint ("CAC"), Doc. 410.

5. Defendants Richard Sinclair, Brandon Sinclair, Mauchley, Mauctrst, Capstone, and Lairtrust also filed counterclaims against Plaintiffs. Docs. 80, 425, and 471. These counterclaims were dismissed with prejudice Doc. 1014.
6. The Flake Defendants reached a settlement with Plaintiffs. Doc. 1179. The claims against them were dismissed. Doc. 1187.
7. Defendants Mauchley and Mauctrst also reached a settlement with Plaintiffs. Doc. 1009. The claims against Defendant Mauchley were dismissed. Doc. 1195. By stipulation of the relevant parties, Mauctrst's answer was stricken and default was entered against Mauctrst with the damages to be determined as part of the prove up hearing. Doc. 1017.
8. Defendants have failed to obey a variety of court orders in this case. They have been sanctioned multiple times. See Docs. 613, 891, and 1014. Additionally, they have been warned about their noncompliance without sanctions being imposed. See Docs. 727 and 860. In the end, Defendants Richard Sinclair, Brandon Sinclair, Lairtrust, and Capstone were specifically warned that the court would enter default against them if they did not comply with court order. Doc. 1014, 19:27-20:3. On September 26, 2014, as a sanction for repeated violations, their answers were stricken and default was entered. Doc. 1070.
9. The defendants in this case who had default entered against them are Richard Sinclair, Brandon Sinclair, Lairtrust, Capstone, and Mauctrst (collectively "Defaulted Defendants").
10. Defendants Richard Sinclair and Brandon Sinclair appealed the order. Docs. 1072 and 1073. Their appeals were dismissed for lack of jurisdiction as the entry of default was not an appealable order. Doc. 1080.
11. On November 28, 2014, Defendant Richard Sinclair filed for bankruptcy. Doc. 1078. All proceedings against Defendant Richard Sinclair were stayed. Doc. 1079. The bankruptcy court modified the automatic stay to permit Plaintiffs to proceed in their case against Richard Sinclair. On May 11, 2015, the stay in this case was lifted. Doc. 1092.
12. Meanwhile, Defendant Richard Sinclair made a motion for a new trial. Doc. 1083. The motion was treated as a request for reconsideration and denied. Doc 1184.
13. On October 16, 2015, the court ordered the parties to confer regarding a status conference

hearing date at which time the prospect of a prove up hearing could be discussed. Doc. 1189.

14. Defendant Richard Sinclair asked that the hearing be set after December 31, 2015 due to medical issues. Doc. 1190.

15. The status conference was set for January 11, 2016 and Defendants Richard Sinclair and Brandon Sinclair were ordered to personally appear. Doc. 1194.

16. The bankruptcy court held a hearing on December 17, 2015 regarding Defendant Richard Sinclair's legal competency. Judge Ronald Sargis concluded that Defendant Richard Sinclair was legally competent to proceed as a party in his bankruptcy case. Doc. 1196-1.

17. On January 11, 2016, Defendants Richard Sinclair and Brandon Sinclair failed to appear at the hearing. The court set a briefing schedule for default judgment and set the prove up hearing for May 10, 2016. Doc. 1199.

18. Plaintiffs made a formal motion for default judgment. Doc. 1203. On April 14, 2016, Defendant Richard Sinclair filed a timely opposition and declaration. Doc. 1208. Defendant Richard Sinclair also submitted 108 exhibits in support of his opposition on May 3, 2016, well after the opposition deadline.

19. On May 5, 2016, Defendant Richard Sinclair filed an ex parte motion to continue the prove up hearing; he asserted that due to his medical issues, he was not allowed to drive until the end of May. Doc. 1217. The request was denied and the court directed Defendant Richard Sinclair to find alternate means of transportation to make it to the hearing. Doc. 1219.

20. The default judgment prove up hearing was held pursuant to Fed. Rule Civ. Proc. 55(b)(2) on May 10, 2016.

21. None of the Defaulted Defendants took part in the hearing. The morning of the hearing, Defendant Richard Sinclair asked to appear telephonically but his request was denied. Doc. 1237, Transcript, 1:13-25.

22. At the hearing, Defendant Richard Sinclair's declaration and exhibits were stricken as a sanction for his failure to appear and failure to comply with court orders requiring his appearance at hearings. Doc. 1237, Transcript, 10:6-14.

23. Andrew Katakis, Sherri Lucy, and Casey Johnson testified. All of Plaintiffs' proffered exhibits, 1 through 50, were admitted. At the conclusion of the prove up hearing, the court invited Plaintiffs to submit proposed findings of fact and conclusions of law ("proposed FOFCOL").

24. Plaintiffs filed proposed FOFCOL and a supplemental brief. Docs. 1226 and 1227. Defendant Richard Sinclair filed an opposition. Doc. 1228.

25. Defendant Richard Sinclair also filed a motion for reconsideration of the court's decision to strike his exhibits from the record. Doc. 1222.

**II. Facts As Alleged in the Consolidated Amended and Supplemental Complaint ("CAC"), Doc. 410**

**Nature Of The Action**

26. This action arises out of the defendants' fraudulent real estate scheme of creating the false appearance of a homeowners association and individually saleable lots at a thirty-five (35) unit town home complex located in Turlock, California, and known as Fox Hollow of Turlock ("Fox Hollow"), in order to obtain loans secured by portions of Fox Hollow and to enrich themselves at the expense of the lenders, the successors to the lenders and the homeowners association by skimming off loan proceeds, dues collected in the name of the homeowners association, and rental income and tenant deposits, all while concealing their scheme and attempting to shield themselves from individual liability by creating shell companies and churning record title to the property (the "Fox Hollow Scheme").

27. Among other things, various defendants as more specifically alleged below: (1) represented to the City of Turlock in 1994 that Fox Hollow had a homeowners association with funds for common area lighting when no homeowners association existed; (2) conveyed title to individual lots at Fox Hollow between themselves in 1997 without either forming a homeowners association or conveying title to the common area at Fox Hollow to the homeowners association as they were required to do by the City of Turlock as a condition to the subdivision that had created such lots; (3) falsely represented to a lender in

1997 as part of obtaining five (5) loans totaling almost $1.5 million secured by lots at Fox Hollow that Fox Hollow had a homeowners association even though no homeowners association existed; (4) obtained a further subdivision of Fox Hollow in 1998 without either forming a homeowners association or conveying title to the common area at Fox Hollow to the homeowners association, and without performing work required to make the lots individually saleable such as constructing firewalls between lots and relocating underground utilities to individual lots, all as they were required to do by the City of Turlock as a condition to the subdivision that created such lots; (5) falsely represented to several lenders in 1998 as part of obtaining fifteen (15) loans totaling more than $1.8 million secured by lots at Fox Hollow that Fox Hollow had a homeowners association even though no homeowners association existed, and fraudulently concealed from those lenders that the lots were not individually saleable and that appraisals upon which the loans were based were subject to the completion of work such as firewalls and utility relocations that defendants had not done; (6) fraudulently concealed from the lenders in 1997 and in 1998 that the collateral for some of the loans did not include the one car garages that corresponded to the units included as collateral; (7) created a shell company called Mauctrst LLC and transferred record title to the lots at Fox Hollow to that shell company only seven (7) days after the fifteen (15) loans in 1998 closed, and then less than one (1) year later and after defaulting on all those loans, put the shell company in bankruptcy to delay the foreclosures; (8) created documents and instruments purporting to give Capstone Trust secured rights to Fox Hollow as a front for defendants to skim further money off Fox Hollow; (9) exploited the fact defendants had not performed the work to make the lots individually saleable to try to force the lenders to sell the loans to defendants at a substantial discount off the amount due, after Fox Hollow was abandoned by the bankruptcy trustee as severely over encumbered; (10) concealed from the lenders that the collateral for some of the loans did not include the one car garages corresponding to the units securing the loans and then exploited the error to prevent the units from being separately saleable; (11) manufactured homeowners association records and purported to

act during the second one-half of 2000 on behalf of the homeowners association (even though they had not formed the homeowners association nor conveyed the common area to the homeowners association); (12) demanded in the name of the homeowners association that the lenders who were completing the foreclosures on their loans pay homeowners association assessments of $300 per month per lot or face delinquency notices, liens and foreclosures; (13) formed Plaintiff Fox Hollow HOA, on December 6, 2000, and thereby imposed upon it the unfunded obligations, liabilities and expenses to complete the requirements of the City of Turlock and to repair and maintain the common area and buildings on the property that defendants had neglected; (14) initiated at least six (6) lawsuits in state court to further delay the remaining foreclosures, all of which they lost; (15) initiated a seventh (7th) lawsuit in state court to further delay the foreclosures on four (4) of the other lots, and then settled that suit by using a fraudulent double escrow to purchase two (2) of the lots from the lender in the first escrow while skimming off loan proceeds in the second escrow on each lot; (16) rented units at Fox Hollow and collected deposits and rents on those units even though they did not own the units; (17) refused to turn over first month's rent and tenant deposits upon demand; and (18) throughout the entire time, neither assessed to themselves nor otherwise paid for the costs and expenses of keeping up, repairing and maintaining Fox Hollow.

28. As a result of the fraudulent scheme, among other things, the lenders lost millions of dollars including on claims assigned to Plaintiff CEMG, and Plaintiff Fox Hollow HOA as the homeowners association by virtue of its obligations under the CC&Rs for the property, and Plaintiff CEMG as the successor to the lenders, were required to and did spend more than $1.3 million to perform the work required by the City of Turlock to make the lots individually saleable and to otherwise remedy the waste and neglect of Fox Hollow committed by defendants.

**Parties**

29. Plaintiff Fox Hollow of Turlock Owners' Association ("Fox Hollow HOA") is, and at all times herein mentioned since on or about December 6, 2000 was, a non-profit mutual

benefit corporation organized and existing under the laws of the State of California, with its principal office located in Stanislaus County, California.

30. Plaintiff California Equity Management Group, Inc. ("CEMG") is, and at all times herein mentioned was, a corporation organized and existing under the laws of the State of California, with its principal office located in Stanislaus County, California.

31. Defendant Mauctrst, LLC ("Mauctrst") is and at all times mentioned herein since on or about April 28, 1998, was a limited liability company, conducting business in Stanislaus County, California, and owned and controlled by Defendants Mauchley and Richard Sinclair.

32. Defendant Gregory Mauchley ("Mauchley") is an individual who, at all times in this action was commenced resided in Stanislaus County, California.

33. Defendant Richard C. Sinclair ("Richard Sinclair") is an individual who, at all times mentioned herein, resided in Stanislaus County, California. Defendant Richard Sinclair and his spouse, Deborah A. Sinclair, will be referred to from time-to-time herein as the "Sinclairs."

34. Defendant Stanley M. Flake ("Flake"), at all times alleged herein, resided in Tuolumne County, California, and was trustee of the Julie Insurance Trust, trustee of the F. Hanse Trust, and trustee of the Capstone Trust.

35. Defendant Brandon Sinclair is an individual who, at all times mentioned herein, resided in Stanislaus County, California.

36. Defendant Lairtrust, LLC ("Lairtrust") is and at all times mentioned herein since on or about May 26, 2000, was a limited liability company, conducting business in Stanislaus County, California, and owned and controlled by the Sinclairs.

37. Defendant Capstone, LLC ("Capstone, LLC") is and at all times mentioned herein since on or about December 3, 2001, was a limited liability company, conducting business in Stanislaus County, California, and owned and controlled by Defendants Richard Sinclair and Brandon Sinclair.

38. Defendant Mauctrst is, and at all times mentioned herein was, the alter ego of Defendants

Mauchley and Richard Sinclair, in that there exists, and at all times herein mentioned, has existed, a unity of interest and ownership between such Defendants such that any separateness has ceased to exist, in that among other things Defendants Mauchley and Richard Sinclair used assets of Defendant Mauctrst for their personal uses, caused assets of Defendant Mauctrst to be transferred to both or one of them without adequate consideration, treated assets of Mauctrst as owned by them individually, withdrew funds from Defendant Mauctrst's bank accounts for their personal use, and inadequately capitalized Mauctrst for the activities it conducted. Adherence to the fiction of separate existence of Mauctrst as an entity distinct from Defendants Richard Sinclair and Mauchley would permit an abuse of the limited liability privilege and would sanction a fraud and promote injustice in that among other things Defendants Mauchley and Richard Sinclair, and each of them, carried on their investment and real estate business in the limited liability company's name exactly as they had conducted it previous to formation, exercising complete control and dominance of such business to such an extent that any individuality or separateness of Defendant Mauctrst and Defendants Mauchley and Richard Sinclair does not, and at all times herein mentioned did not, exist.

39. Plaintiffs are informed and believe, and thereupon allege, that at all times mentioned herein, each and every Defendant was the agent and employee of each and every other Defendant and, in doing the acts herein alleged, was acting within the actual and apparent course and scope of such agency and employment and with the permission and consent of each other Defendant, and each Defendant ratified the conduct of each other Defendant and is estopped by reason of his, her and its conduct and statements from denying such agency and employment and that he, she or it acted within such course and scope of agency and employment.

**Jurisdiction and Venue**

40. This court's jurisdiction is based on 28 U.S.C. § 1331; 15 U.S.C. § 1964(a); and applicable principles of supplemental jurisdiction under 28 U.S.C. § 1367(a).

41. Venue is proper in this judicial district and division pursuant to 28 U.S.C. §§ 1391(b); 18

U.S.C. § 1965; and Local Rule 3-120(d).

**Background Facts For Claims**

**The Fox Hollow Property**

42. The real property about which the present action relates (the "Fox Hollow Property") is: commonly known as 152 20th Century Boulevard, Turlock, California; located in the City of Turlock, County of Stanislaus, State of California; and more particularly described as: The East Half Of That Portion Of Land As Follows:

Beginning At The Northeast Corner Of Section 15, Township 5 South, Range 10 East, Mount Diablo Base And Meridian, According To United States Government Township Plats Running Thence West On The Section Line Between Section 10 And 15, 1,059.3 Feet; Thence South 0 Degrees 45 Minutes East 472.5 Feet As Place Of Beginning; Thence Same Course 472.5 Feet; Thence South 89 Degrees 30 Minutes East 368.76 Feet; Thence North 0 Degrees 45 Minutes West 472.5 Feet; Thence North 89 Degrees 30 Minutes West 368.76 Feet To Place Of Beginning. Excepting Therefrom The West 15 Feet.

43. The Fox Hollow Property consists of approximately 1.76 acres, and is rectangular in shape, with approximately 170 feet fronting on 20th Century Boulevard, and a depth of approximately 442 feet.

44. On or about March 6, 1996, Defendant Flake as executive trustee of the Julie Insurance Trust, filed in Book 37 of Maps, Page 38, Stanislaus County Records, a final subdivision map for the Fox Hollow Property, and thereby subdivided the Fox Hollow Property into Lots 1, 11, 18 and 19, and a designated remainder ("Fox Hollow Subdivision Map # 1"). Such lots as created by the filing of the Fox Hollow Subdivision Map #1 shall be referred to herein by their lot number (e.g., "Lot 1").

45. Fox Hollow Subdivision Map # 1 as filed in the Official Records of Stanislaus County, California on March 6, 1996, depicted Lot 18A contiguous to Lot 19 and adjacent to Lot 18.

46. On or about July 21, 1998, Defendant Mauchley filed in Book 38 of Maps, Page 19, Stanislaus County Records, a final subdivision map for the Fox Hollow Property, and thereby further subdivided the designated remainder of the Fox Hollow Property into Lots 2 through 10, Lots 12 through 17, and a common area ("Fox Hollow Subdivision Map #

2"). Such lots as created by the filing of the Fox Hollow Subdivision Map #2 shall be referred to herein by their lot number (e.g., "Lot 2").

47. Fox Hollow Subdivision Map # 2 as filed in the Official Records of Stanislaus County, California on July 21, 1998, depicted Lot 2A as contiguous to Lot 12 and across the common area from Lot 2, depicted Lot 6A as contiguous to Lot 15 and across the common area from Lot 6, depicted Lot 7A as contiguous to Lot 16 and across the common area from Lot 7, depicted Lot 8A as contiguous to Lots 16 and 7A and across the common area from Lot 8, depicted Lot 9A as contiguous to Lot 18 and across the common area from Lot 9, and depicted Lot 10A as contiguous to Lot 17 and across the common area from Lot 10.

**Initial Purchase, Encumbrance, And Development Of Fox Hollow Property As An Apartment Complex**

48. The Sinclairs purchased the Fox Hollow Property in November 1988 after obtaining approval from the City of Turlock to construct a 35-unit townhouse apartment complex, and obtained a construction loan in the face amount of $1,492,500 from Stockton Savings & Loan Association ("Stockton S&L"), secured by a first deed of trust against the Fox Hollow Property, that was recorded on November 7, 1988 (the "Stockton Construction Loan").

49. Construction of the apartment complex on the Fox Hollow Property started in 1989 and was completed in late 1990 or early 1991. The apartment complex consisted of two rows of buildings along the east and west sides of the property facing each other, with a swimming pool at the south end, and access to 20th Century Boulevard at the northern boundary.

50. The buildings included three (3) detached single-family dwellings with one-car garage, nine (9) duplexes with attached one-car garages, and seven (7) duplexes with detached one-car garages.

51. The Sinclairs stopped making payments on the Stockton Construction Loan in July 1992, and Stockton S&L recorded a Notice of Default on August 11, 1993, asserting a default in the amount of $172,525.92.

**Entitlements Obtained From The City Of Turlock To Subdivide And Convert The Fox Hollow Property Into A Twenty (20) Lot Planned Unit Development With Homeowner's Association**

52. On or about the summer of 1992, Defendant Richard Sinclair made a preliminary proposal to the Community Development Department of the City of Turlock (the "Turlock Development Department") to subdivide the Fox Hollow Property and convert the property to a planned unit development.

53. On or about August 10, 2002, the Turlock Building Department responded to the preliminary proposal in writing, by letter sent to Richard Sinclair, in which the Turlock Building Department advised Defendant Sinclair that: The creation of a multi-lot subdivision from the existing apartment complex would require a formal submittal of applications for rezone, a planned development permit, a tentative subdivision map, and a conditional use permit; Mr. Sinclair's proposal to promote ownership of individual lots with multi-unit structures tended to promote a pattern of absentee owners sharing little beyond their investment; the City would require a complete building code analysis report of existing building construction and proposed property lines and would require construction modifications so that units were structurally and architecturally independent of each other prior to the recording of a final subdivision map; and under the circumstances, staff did not support the proposal as presented because of concerns about the proposal creating major challenges for a successful residential development.

54. On or about September 17, 1992, Defendant Richard Sinclair confirmed in writing in a letter sent to the Director of the Turlock Development Department that he agreed to implement the conditions for approval of the project into CC&Rs for the property "to protect the general public's welfare and safety in perpetuity," and that he had proceeded to have the CC&Rs and homeowners documents redrafted accordingly.

55. On or about February 2, 1993, Defendant Richard Sinclair as "Applicant" and "Owner" applied to the City of Turlock for a conditional use permit, planned unit development, rezoning and vesting tentative map, to subdivide the Fox Hollow Property into nineteen

(19) lots, and a common area, and to convert the apartment complex to a planned unit development with a homeowners association owning and being responsible for the maintenance of the common area and certain aspects of the individual lots (the "Project").

56. As part of the application for approval of the Project, Defendant Richard Sinclair represented through his engineer on the Vesting Tentative Map of Fox Hollow submitted to the City of Turlock on or about February 5, 1993, that the garages that were detached from the dwelling units are denoted as Lots with a number followed with the capital letter "A" and that the relationship between those "A" lots and the dwelling units was that a garage lot corresponded to the dwelling unit with the same numeric lot number, as for example as stated on the Vesting Tentative Map "GARAGE LOT 6A CORRESPONDS TO DWELLING UNIT LOT 6."

57. On or about March 4, [1993], the Turlock Community Development Department issued a letter to Defendant Richard Sinclair confirming that a complete building code analysis of the existing building construction would be required, that any modifications to the existing structures that were required to meet current standards for subdivided lots would need to be accomplished prior to recording the final subdivision map, that the existing landscaping must be repaired prior to recording of a final map, and that appropriate CC&Rs needed to be recorded to ensure the continued maintenance of the development.

58. The Project was approved by the Turlock City Planning Commission on or about April 1, 1993, and by the Turlock City Council on or about May 25, 1993, subject to various conditions, including among others:

> * * *
> 4. Prior to recordation of a final map(s) the applicant shall:
>
> a) Provide the City of Turlock a complete building codes analysis of the existing buildings and facilities; and
>
> b) All modifications necessary to insure compliance with the Turlock Municipal Code and the Uniform Building Code shall be completed. [Building Department]
>
> * * *
>
> 11. Upon any subdivision of the site, a homeowners association shall be formed and responsible for the maintenance of all common areas, roadway, parking,

fencing and landscaping in accordance with Exhibit C. [Planning Department]

59. Defendant Richard Sinclair applied to and obtained approval of the Project from the City of Turlock on the basis that the Project involved thirty-five (35) town homes with one car garages on 1.76 acres and was “creating [a] 20 lot subdivision consisting of 3 detached single family dwellings, 7 detached duplexes, 9 duplexes attached by garages, and 1 lot for common area, pool, driveways, [and] parking.”

60. A structural building code compliance analysis for the Fox Hollow Property as required under Condition 4 a) was performed by an architect retained by Defendant Richard Sinclair and submitted to and approved by the City of Turlock in or about December 1993. The structural work specified in the analysis to meet current standards for individually owned lots included installing twenty-seven (27) firewalls for the garages, three (3) fire walls in the units, eliminating six (6) roof overhangs, removing seven (7) windows, and adding two (2) roof vents.

61. In January 1994, Defendant Richard Sinclair submitted an application to the Turlock Community Development Department, for a modification to Condition 4 b) to the conditions of approval for the Project so that the work required to bring the existing buildings into compliance with current standards be deferred until sometime after the recording of a final map for the Project (the “Modification Application”).

62. Defendant Richard Sinclair was advised in a letter sent on or about February 7, 1994, from the Turlock Community Development Department, that after further discussion involving the City Engineer, City Attorney’s Office, and the building official and the senior planner of the Community Development Services, they were unable to develop an option that would ensure no City involvement in completion of the project in the event the property owners failed to fulfill their obligations in the matter after recording the final map, and accordingly, the options available were to: Complete the original conditions of the vesting map, file multiple final maps and completing the conditions covering the portion of the property subject to each final map, or re-subdividing the property as a condominium project.

63. On or about February 17, 1994, the Turlock Planning Commission denied the Modification Application and thereby continued to require that all modifications to meet current standards for individually owned lots be completed prior to recording the final map.

64. Thereafter, on or about April 29, 1994, Defendant Richard Sinclair notified the Planning Department of the City of Turlock in writing that he would be completing multiple maps for the subdivision and that: "There are sufficient funds within the Homeowner's Association to replace and maintain said [common area] lighting." Said statement was false when made in that no homeowners association had been created nor were there funds within a homeowner association to replace and maintain lighting or otherwise maintain the common area.

65. On or about June 8, 1994, Defendant Richard Sinclair filed a Voluntary Petition under Chapter 11 of the Bankruptcy Code on behalf of himself and his spouse, with the United States Bankruptcy Court, Eastern District of California, Case No. 94-92271-A-11 (the "Sinclair Bankruptcy Case").

**Defendants Lose Fox Hollow Property In Late 1994 Through Foreclosure And Then Reacquire Fox Hollow Property In October 1995**

66. The Sinclairs lost the Fox Hollow Property to Stockton S&L through a non- judicial foreclosure on the Stockton Construction Loan on or about December 13, 1994.

67. On or about the summer of 1995, Defendant Richard Sinclair contacted Defendant Flake and Defendant Mauchley; and discussed with each of them reacquiring the Fox Hollow Property from the lender, and continuing to pursue the Project.

68. Pursuant to such discussions, Defendant Richard Sinclair formed a trust for Defendant Mauchley in August 1995 called "Mauctrst", and Defendant Stanley Flake, as Trustee of The Julie Insurance Trust, purchased the Fox Hollow Property from the lender (which had been renamed Stockton Federal Bank) on or about October 31, 1995, for approximately $1.27 million that Defendant Flake, as trustee of the F. Hanse Trust, had advanced for the purchase.

**Fox Hollow CC&Rs Recorded In September 1996**

69. On or about September 16, 1996, Defendant Flake, as trustee of the Julie Insurance Trust, executed as the declarant, and Defendant Sinclair caused to be recorded as Document No. 96-0078121-00 in the Official Records of Stanislaus County, California, a Declaration of Covenants, Conditions and Restrictions for the Fox Hollow Property (the "Fox Hollow CC&Rs").

70. Article I, Section 16 of the Fox Hollow CC&Rs, defines "Association" as the "Fox Hollow of Turlock Owners' Association, a non-profit mutual benefit corporation, membership in which shall be limited to owners (as hereinafter defined) and in which all owners have a membership interest."

71. Article I, Section 11 of the Fox Hollow CC&Rs, defines "Owner" and "Owners" as "the record owner or owners, whether one or more persons or entities, of a fee simple title to a lot. . . ."

72. Article I, Section 11, defines "Lots" as "Those certain parcels of land, together with the single family residential improvements attached thereto, described on the map of Fox Hollow subdivision, as Lots 1-19, County of Stanislaus, State of California."

73. Defendant Flake, as trustee of the Julie Insurance Trust, declared in Article II, Section 1, that the Fox Hollow Property was subject to the Fox Hollow CC&Rs.

74. Pursuant to the Fox Hollow CC&Rs: Defendant Flake, as trustee of the Julie Insurance Trust, was required to convey to the Association fee title to the common area for the Fox Hollow Property free and clear of all liens and encumbrances "prior to the conveyance of title to the first lot" and to appoint the initial Board of the Association consisting of three (3) Directors (Art.III, §§ 3 & 6); the Association was charged with the duty to repair and maintain the common area and certain aspects of the Lots (Art. IV § 1); and the Board of the Association was mandated to "establish regular monthly assessments for operations and maintenance of the Project . . . payable in monthly installments on the first day of each month commencing on the first day of the first month following conveyance of the first Lot." (Art. V, § 2).

75. Article V, Section 1 of the Fox Hollow CC&Rs provides in part that: "Declarant hereby

covenants and agrees for each Lot owned by it within the Project, and each Owner of any Lot by acceptance of a deed is deemed to covenant and agree, to pay to the Association the dues levied pursuant to this Article."

76. Defendants reaffirmed in the Fox Hollow CC&Rs that the "A" lots were not separate from their corresponding dwelling units in that among other things: (a) Article V provides that the monthly assessments for operations and reserves shall be charged to the residential units on the Lots; and (b) the easements for ingress and egress over the common area under Article VI are "for the benefit of the Lots and Lot Owners."

**Defendants' Five (5) Loan Fraudulent Financing Scheme In February 1997**

77. On or about early 1997, Defendants Richard Sinclair, Mauchley and Flake carried out fraudulent record title churning and financing transactions involving Fox Hollow, by creating the false appearance of a planned unit development with a homeowners association and the false appearance of an arms length transaction between Defendants Flake and Mauchley in order to borrow more than $1.4 million against the Fox Hollow Property.

78. Defendant Richard Sinclair established the price for the conveyance of Lots 1, 11, 18 and 19, and the remainder of the Fox Hollow Property, from Defendant Flake, as trustee of the Julie Insurance Trust, to Defendant Mauchley at $1.9 million.

79. As part of the scheme, Defendant Flake, as trustee of the Julie Insurance Trust, conveyed record title to Lots 1, 11, 18, 19, and the balance of the Fox Hollow Property, to Defendant Mauchley, by five separate deeds accepted by Defendant Mauchley, and recorded in the Official Records of Stanislaus County, California on February 26, 1997.

80. Also, as part of the scheme, Defendant Richard Sinclair assisted Defendant Mauchley in obtaining loans on Lots 1, 11, 18 and 19, each in the amount of $119,000, and an additional loan in the amount of $1 million against the balance of the Fox Hollow Property, from GMAC Mortgage Corporation ("GMAC"), secured by first deeds of trust in favor GMAC, also recorded in the Official Records of Stanislaus County, California, on February 26, 1997.

81. Also, as part of the scheme, the $1.9 million price for Fox Hollow was paid to Defendant Flake from the proceeds on the five (5) loans from GMAC and by a Deed of Trust in favor of Defendant Flake, as trustee of the Capstone Trust, against the Fox Hollow Property, executed on or about February 21, 1997, by Defendant Mauchley, and recorded on or about March 3, 1997, that purportedly secured an obligation in the amount of $444,888, and provided that Defendant Flake, as trustee of the Capstone Trust will provide lot releases for the fifteen (15) lots being created (the lots other than Lots 1, 11, 18 and 19) for the payment of $37,037 per lot, and lot releases on Lots 1, 11, 18 and 19 for the payment of $16,447.33 per lot.

82. Defendant Mauchley represented and promised in the "Planned Unit Development Rider" included in the deeds of trust in favor of GMAC that were recorded against Lots 1, 11, 18 and 19, on or about February 26, 1997, that:

> The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in covenants, conditions and restrictions of record (the "Declaration").
>
> The Property is a part of a planned unit development known as Fox Hollow . . . [and] the Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common area and facilities of the PUD (the "Owners Association"), and the uses, benefits and proceeds of Borrower's interest. PUD COVENANTS. In addition to the covenants, and agreements made in the security instrument, Borrower and Lender further covenant and agree as follows: [¶] A. PUD Obligations. Borrower shall perform all of Borrower's obligations under the PUD's constituent documents. The "Constituent Documents" are the: (i) Declaration; (ii) articles of incorporation, trust instrument or equivalent document which creates the Owners Association; and (iii) any by laws or other rules or regulations of the Homeowners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

83. Said representations and promises in the Planned Unit Development Riders were false when made. The true facts known by Defendants Richard Sinclair, Mauchley and Flake, and concealed by them from GMAC, were that: there was no homeowners association or equivalent entity to own or manage the common area and facilities of the PUD; title to the common area had not been transferred to a homeowners association; and Defendants Richard Sinclair, Mauchley and Flake, and each of them, had no intention at that time to form a homeowners association, to transfer title to the common area to a homeowners

association, or to charge and collect dues and assessment to maintain the common area and lots, all as required of them in the Fox Hollow CC&Rs and by the conditions of approval by the City of Turlock for the Project.

84. Defendants Richard Sinclair, Mauchley and Flake, and each of them, also concealed from GMAC that the corresponding one car garage for Lot 18 was on Lot 18A, that the corresponding one car garage for Lot 18 was not included in the legal description under the deed of trust for the loan on lot 18, that the corresponding one car garage for Lot 18 was left as additional collateral for Defendant Flake to receive the balance of the sales price from the creation of the other fifteen(15) lots, and that the corresponding one car garage for Lot 18 was left out as part of the deal between Defendants Richard Sinclair, Mauchley and Flake.

85. GMAC made said loans in reliance upon said representations and promises, and had it known the true facts and concealed facts, it would not have completed said loans without compliance with the Fox Hollow CC&Rs and City of Turlock conditions for the Project, and without including the corresponding one car garage on Lot 18A in the legal description in the deed of trust for the loan on Lot 18.

**Defendants' Fifteen (15) Loan Fraudulent financing Scheme In July 1998**

86. Defendants Richard Sinclair, Mauchley and Flake, continued the fraudulent record title churning and financing scheme for Fox Hollow in 1998.

87. As part of the scheme, Defendant Richard Sinclair, in the name of Defendant Mauchley, filed applications for loans against each of the fifteen (15) remaining lots at Fox Hollow and continued to process Fox Hollow Subdivision Map # 2, for purpose of obtaining said loans.

88. Each of said loans was conditioned on the filing of Fox Hollow Subdivision Map # 2 to create the lots, and each of said loans was based on each of the lots being individually saleable.

89. As part of said scheme, by early 1998, Defendants Richard Sinclair, Mauchley and Flake planned to transfer record title to the lots at Fox Hollow to an entity to be called Mauctrst

LLC immediately after such loans funded. Pursuant to such plan: Defendant Mauchley executed an "Option & Operating Agreement For Real Property And Contracts" on or about January 1, 1998, individually, as "Mauctrst" and as member manager of Mauctrst LLC, that provided among other things that Defendant Richard Sinclair would be paid a monthly fee of $10,000 for overseeing the management and control of various properties including Fox Hollow; Defendant Richard Sinclair executed and caused to be filed with the California Secretary of State "Articles of Organization" for Mauctrst LLC on or about April 28, 1998; Defendant Richard Sinclair prepared, Defendant Mauchley executed, Defendant Mauctrst accepted and Defendant Richard Sinclair caused to be recorded in the Official Records of Stanislaus County, California, a grant deed conveying record title to Lots 1 through 19 to Mauctrst on or about July 29, 1998 (only seven (7) days after the July 1998 loans closed); and Defendant Richard Sinclair prepared and Defendants Mauctrst and Mauchley executed a deed of trust from Mauctrst LLC dated July 23, 1998 and recorded on December 3, 1998 against Lots 1 through 19, that purportedly secured an obligation in the amount of $271,000, and provided that Defendant Flake, as trustee of the Capstone Trust would provide lot releases for lots 8, 10, 16 upon the payment of $7,742.85 per lot, and for Lots 1-7 , 9, 11-15, and 17-19 upon the payment of $15,485.70 per lot (the "July 1998 Flake Lot Release Trust Deed").

90. As part of said scheme, Defendant Mauchley, on or about July 9, 1998, executed loan applications for each of such loans, describing the property by unit number or numbers, and representing that the property had been acquired in 1995.

91. On or about July 22, 1998, Defendant Mauchley, after he had recorded Fox Hollow Subdivision Map # 2, creating fifteen (15) more lots with duplexes or single family townhouses, closed the fifteen (15) new loans secured by a first deed of trust against the each lot. The total amount of these loans was more than $1.8 million.

92. Each town home at Fox Hollow was assigned a unit number by the U.S. Post Office with the even numbered units generally were located along the east side of the property, and the odd numbered units were generally located along the west side of the property. The

following table correlates lot number, unit number, lender and loan amount for the February 1997 and July 1998 loans at Fox Hollow [the banks and finance companies that loaned money to Defendant Mauchley in 1997 and 1998 are not parties in this case and are collectively referred to as "Lenders"]:

| Lot No. | Unit No. | Lender Abbreviation | Loan Amount |
|---|---|---|---|
| 1 | 133 & 135 | GMAC | $119,000 |
| 2 | 129 & 131 | Oceanmark / Bank One | $130,000 |
| 3 | 125 & 127 | Granite Bay / Allied American Funding / Conti | $130,000 |
| 4 | 121 & 123 | Alternative / Bank One | $135,000 |
| 5 | 117 & 119 | Oceanmark / Bank One | $130,000 |
| 6 | 113 & 115 | Alternative / HFC | $135,000 |
| 7 | 109 & 111 | Granite Bay / Allied American Funding / Conti | $130,000 |
| 8 | 107 | Oakmont / HFC | $74,000 |
| 9 | 101 & 103 | Granite Bay / Allied American Funding / Conti | $130,000 |
| 10 | 105 | Oakmont / HFC | $74,000 |
| 11 | 130 & 132 | GMAC | $119,000 |
| 12 | 126 & 128 | Alternative / Norwest Bank | $135,000 |
| 13 | 122 & 124 | Oceanmark / Ocwen | $130,000 |
| 14 | 118 & 120 | Granite Bay / Allied American Funding / Conti | $130,000 |
| 15 | 114 & 116 | Oceanmark / Bank One | $130,000 |
| 16 | 108 | Oakmont / HFC | $74,000 |
| 17 | 110 & 112 | Alternative / Chase | $135,000 |
| 18 | 100 & 102 | GMAC | $119,000 |
| 19 | 104 & 106 | GMAC | $119,000 |
| | | Total | $2,278,000 |

93. A portion of the proceeds on the July 1998 loans was used to pay off the $1 million loan

from GMAC, and to pay Defendant Flake the amount remaining due on the deed of trust he received at the time of the sale of the Fox Hollow Property to Defendant Mauchley in February 1997, as well as other advances he made, in the amount of approximately $575,000.

94. Defendant Mauchley represented and promised in the "Planned Unit Development Rider" included in the deeds of trust securing the loans on Lots 3, 4, 6, 7, 8, 9, 10, 12, 14, 16 and17, and that were recorded on or about July 22, 1998, that:

> The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in covenants, conditions and restrictions of record (the "Declaration").
>
> The Property is a part of a planned unit development known as Fox Hollow . . . [and] the Property also includes borrower's interest in the homeowners association or equivalent entity owning or managing the common area and facilities of the PUD (the "Owners Association"), and the uses, benefits and proceeds of Borrower's interest.
>
> PUD COVENANTS. In addition to the covenants, and agreements made in the security instrument, Borrower and Lender further covenant and agree as follows: [¶] A. PUD Obligations. Borrower shall perform all of Borrower's obligations under the PUD's constituent documents. The "Constituent Documents" are the: (i) Declaration; (ii) articles of incorporation, trust instrument or equivalent document which creates the Owners Association; and (iii) any by laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

95. Said representations and promises in the Planned Unit Development Riders were false when made. The true facts known by Defendants Richard Sinclair, Mauchley and Flake, and concealed by them from each of such lenders, were: there was no homeowners association or equivalent entity to own or manage the common area and facilities of the PUD; title to the common area had not been transferred to a homeowners association; and Defendants Richard Sinclair, Mauchley and Flake, and each of them, had no intention at that time to form a homeowners association, to transfer title to the common area to a homeowners association, or to charge and collect dues and assessment to maintain the common area and lots, all as required of them in the Fox Hollow CC&Rs and by the conditions of approval by the City of Turlock for the Project.

96. Defendants Richard Sinclair, Mauchley and Flake, and each of them, concealed from each

of the lenders that the corresponding one car garages for Lots 2, 6, 7, 8, 9 and 10, were on Lots 2A, 6A, 7A, 8A, 9A and 10A; that the corresponding one car garages for Lots 2, 6, 7, 8, 9 and 10, were not included in the legal description in the deed of trust for the loan on each such lot; and that the corresponding one car garages for Lots 2, 6, 7, 8, 9 and 10, were left as additional collateral for Defendant Flake and were left out as part of the deal between Defendants Richard Sinclair, Mauchley and Flake in 1997.

97. Defendants Richard Sinclair, Mauchley, Flake and Mauctrst, and each of them, concealed from the lenders on such loans that they had not, despite being required to do so in the Turlock City conditions for approval of the Project, made the modifications to the structures as required in the building code analysis and had not relocated utilities so that each lot was individually served by electricity, telephone, gas and cable television, and thereby prevented such lots from being individually saleable even though each lot was provided as collateral for one of the loans and the value of the lot as collateral was based upon the lot being individually saleable.

98. As part of said July 1998 loans, Granite Bay Funding, closed the loans to Defendant Mauchley secured by first deeds of trust against lots 3, 7, 9 and 14, each securing a loan in the amount of $130,000, and then for value received completed the sale, transfer and assignment of such loans to CEMG's processor, Allied American Funding, on or about August 1998, who that in turn, sold, transferred and assigned said loans to CEMG's predecessor, Conti Mortgage Corporation on or about August 1998. Granite Bay Funding, Allied American Funding, and Conti Mortgage Corporation shall be collectively referred to hereinafter as "Conti" and Lots 3, 7, 9 and 14 shall be referred to collectively as the "Conti Lots."

99. Each of said lenders (including without limitation Conti) made said loans and purchased said loans in reliance upon said representations and promises, and had they known the true facts and concealed facts, they each would not have made and purchased said loans as alleged herein without compliance with the Fox Hollow CC&Rs and City of Turlock conditions, and without including the corresponding one car garages on Lots 2A, 6A, 7A,

8A, 9A and 10A, in the legal description in the deed of trust for the loan on Lots 2, 6, 7, 8, 9 and 10.

100. Defendant Flake in his various capacities, advanced approximately $1.27 million to purchase the Fox Hollow Property in October 1995, and as a result of the February 1997 financing scheme, received approximately $1.4 million in cash in February 1997, and as a result of the July 1998 financing scheme received approximately $545,000 in cash in July 1998 and the July 1998 Flake Lot Release Trust Deed.

**Defendants Use Their Refusal And Failure To Complete The Requirements To Subdivide The Fox Hollow Property To Try To Force The Lenders To Sell The Loans To Defendants At A Substantial Discount**

101. On or about July 1, 1999, and after Defendant Mauchley had gone into default on each of the loans obtained as part of the financing scheme in February 1997 and July 1998, Defendant Richard Sinclair, in the name of Mauctrst, filed a Voluntary Petition under Chapter 11 of the Bankruptcy Code, with the United States Bankruptcy Court, Eastern District of California, Case No. 99-28903-C-11 (the "Mauctrst Bankruptcy Case").

102. Defendants continued to conceal their failure to comply with the requirements of the City of Turlock for the subdivision and conversion to a planned unit development for the Fox Hollow Property until at least on or about November 18, 1999, when they started disclosing some of the information in an effort to try to renegotiate or purchase at a substantial discount the loans on the Lots at Fox Hollow Property.

103. The first of such disclosure was made by Defendants Mauctrst, Richard Sinclair, and Mauchley, on or about November 18, 1999, in a First Amended Disclosure Statement filed in the Mauctrst Bankruptcy Case, in which they admitted:

> At the time that the 19 loans were put into place on Fox Hollow . . . 19 appraisals were obtained valuing the 16 duplexes at $185,000 each with the other 3 single family residences valued at $93,500 each. One of the duplex appraisals is attached as Exhibit "F" and incorporated herein by reference. The total appraised value at the time was $3,240,500, subject to final completion of the subdivision firewalls and underground relocation of utilities to accommodate individual ownership in this planned united development.

104. Defendants Mauctrst, Richard Sinclair and Mauchley made the same admission in

their Second Amended Disclosure Statement filed in the Mauctrst Bankruptcy Case on December 17, 1999.

105. Prior to the time the loans closed, Defendants Richard Sinclair, Mauchley and Flake believed that the value of Fox Hollow would be enhanced upon completion of the requirements of the City of Turlock so that the lots would be individually saleable. Moreover, Defendant Richard Sinclair was aware that completion of such requirements was material in that he was aware during the Sinclair Bankruptcy Case, that the appraised value for Fox Hollow as an apartment complex was approximately $1.7 million dollars while he placed the value of Fox Hollow with individually saleable lots at approximately $3 million.

106. The schedules filed by Defendants Richard Sinclair, Mauchley and Mauctrst in the Mauctrst Bankruptcy Case on or about September 7, 1999 and amended schedules filed on or about December 8, 1999, also disclosed that Mauctrst had paid Defendant Richard Sinclair over the period of twelve (12) months proceeding the filing of the Bankruptcy Case, approximately $160,000.

107. Defendants Mauctrst, Richard Sinclair and Mauchley also admitted in such schedules and amended schedules filed in the Mauctrst Bankruptcy Case, that Conti Mortgage Corporation was the successor to and held an undisputed security interest on the July 1998 loans against Lots 3, 7, 9 and 14.

108. On or about December 9, 1999, the trustee in the Mauctrst Bankruptcy Case filed a motion for authority to abandon various real property, including the Fox Hollow Property, on the ground that such property was substantially over-encumbered.

109. On or about January 14, 2000, the Bankruptcy Court approved the abandonment by the bankruptcy trustee of the Fox Hollow Property back to Mauctrst.

110. On or about January 25, 2000, Defendant Richard Sinclair, on behalf of Defendants, disclosed in writing in letters mailed to representatives of the lenders holding the July 1998 deeds of trusts on Lots 2, 3, 4, 5, 7, 9, 13, 14 and 15, in an effort to purchase their loans for $80,000 (when the amount then due exceeded $130,000):

> Currently, this property cannot be sold as a duplex or single family residence. The subdivision has not been completed. Underground electrical work, relocation of utilities and individual meters are among the requirements still to be completed for the City of Turlock. . . .
>
> * * *
>
> Only someone who controls all properties can complete these requirements. I have a client who is willing to do this and would complete the purchase quickly.

111. On or about October 12, 2000, Defendant Richard Sinclair, purportedly on behalf of the homeowners association for the Fox Hollow Property, sent a fax to the escrow holder handling escrow for the sale of lots 2, 4 and 15 at Fox Hollow, stating:

> Please allow this letter to serve as notice to Chicago Title and PMZ that title to the lots cannot be transferred at the present time. A few of the reasons are as follows:
>
> (1) The subdivision requirements to sell lots has not been completed. The City of Turlock has a number of requirements including, but not limited to, the movement of the electrical and other utility lines to each individual lot. You will have to obtain permission from the other lot owners to re-route those utility lines and from the Homeowners Association and receive approval from the City of Turlock for the balance of the subdivision improvements and requirements prior to offering the property for sale or transferring title.
>
> (2) Additionally, firewalls between lots in the garages and on the back of each duplex must be installed. New permits will have to be obtained and go through the permit application process with respect to each unit.
>
> (3) Each lot has additional individual requirements for corrections and improvements before those lots can be offered for sale.
>
> * * *
>
> (5) The deeds of trust may not have included security on some or all of the garages, particularly the detached ones. Therefore, title to those garages may remain in the name of the former owner. Restrictions regarding sale and use without garages should be explored both with the City of Turlock and with the recorded CC&Rs and Homeowners Association documents.

112. While Defendants, as alleged above, began disclosing their failure to meet certain of the requirements of the City of Turlock to subdivide the Fox Hollow Property and convert it into a planned unit development, they continued to conceal their failure to comply with other requirements until at least late 2000 including the requirements to: (a) Form the homeowners association; (b) convey the common area to the homeowners association; (c) appoint a board of directors for the homeowners association; and (d) commence the assessment of monthly dues sufficient to fund the operation and

maintenance of the Fox Hollow Property in accordance with the Fox Hollow CC&Rs.

**Defendants Fraudulent HOA Dues And Assessments Billing Scheme In 2000 and Early 2001**

113. The lenders (or their successors) who had made the loans as hereinabove alleged in February 1997 and July 1998 began completing the foreclosures on those loans in June 2000 after the Fox Hollow Property was abandoned by the Mauctrst Bankruptcy trustee back to Mauctrst.

114. The foreclosures were completed with the recording of trustee's deeds upon sale on Lot 7 on May 22, 2000, on Lot 4 on July 31, 2000, on Lots 1, 11, 18 and 19 on September 29, 2000, on Lots 5 and 15 on October 5, 2000, on Lot 2 on October 23, 2000, on Lot 17 on October 31, 2000, on Lot 12 on February 9, 2001, on Lot 13 on April 2, 2001, on Lot 16 on January 8, 2002, on Lot 10 on January 14, 2002, on Lots 6 and 8 on January 17, 2002, on Lot 3 on May 22, 2003, on Lot 9 on May 30, 2003, and on Lot 14 on June 25, 2003. Mauctrst was the record title holder of each of Lots 1 through 19 from July 29, 1998, and until the date the trustees deed upon sale for the lot was recorded, as alleged herein.

115. As a part of the ongoing misuse of the homeowners association and their efforts to defraud the lenders, Defendants Richard Sinclair, Mauchley and Brandon Sinclair, purportedly as the Board of Directors of Fox Hollow HOA (even though the articles of incorporation for Fox Hollow HOA had not been filed with the California Secretary of State), started on or about August 1, 2000, to send through the U.S. mail written dues statements to the various lenders on the Lots at Fox Hollow, demanding payment of $300 per month per lot, including without limitation, as follows: On Lot 1 to GMAC from September 21, 2000 through December 31, 2000; on Lot 2 to Bank One from October 1, 2000 through January 31, 2001; on Lot 4 to Bank One from August 1, 2000 through January 31, 2001; on Lot 5 to Bank One from October 1, 2000 through January 31, 2001; on Lot 7 to Conti Mortgage from August 1, 2000 through January 31, 2001; on Lot 11 to GMAC from September 21, 2000 through December 31, 2000; on Lot 15 to Bank One from October 1, 2000 through January 31, 2001; on Lot 18 to GMAC from September 21, 2000 through December 31, 2000; and on Lot 19 to GMAC from September 21, 2000

through December 31, 2000.

116. On or about November 2000, Defendant Richard Sinclair, purportedly on behalf of the homeowners association, sent a letter to an attorney for Bank One National Association, as trustee, formerly FKA First National Bank of Chicago as trustee ("Bank One"), demanding payment of dues for October and November on Lots 2, 4, 5 and 15, and stating in the "PS" "A number of people have inquired about purchasing the duplexes that your clients owns. Please advise us of the price as-is, where-is, so we may pass along the information." (D348.)

117. Defendants Richard Sinclair, Mauchley and Brandon Sinclair, on or about December 2000, pursued foreclosures on various lots for failure to pay assessments, and recorded on December 19, 2000, and caused to be sent through the U.S. mail notices of delinquent assessment in the name of Fox Hollow HOA, for lots 1, 2, 4, 5, 11, 15, 18 and 19.

118. Thereafter, on or about January 22, 2001, Defendants Richard Sinclair, Mauchley and Brandon Sinclair recorded and caused to be sent through the U.S. mail notices of delinquent assessment in the name of Fox Hollow HOA, for lots 2, 4, 5, 7 and 15.

119. Defendants Richard Sinclair, Mauchley and Brandon Sinclair, represented in each such dues statement, letter and notice of delinquent assessment that there was a homeowners association, that Brandon Sinclair was president of the homeowners association, and that dues of $300 per lot per month were due and owing to the homeowners association starting August 1, 2000.

120. Said representations were false when made. The true facts known by Defendants Richard Sinclair, Mauchley, and Brandon Sinclair, and concealed by them from each of such lenders were that: (1) Defendants had failed and refused to form Fox Hollow HOA as a non-profit mutual benefit corporation until on or about December 6, 2000; (2) Defendants had failed and refused to collect any dues and assessments from themselves; and (3) Defendants intended to and did use payments of association dues and assessments to finance lawsuits they had initiated against various lenders seeking to enjoin and delay

the foreclosures on their loans.

121. Each of said lenders, including without limitation GMAC, made dues payments to said Defendants in reliance upon said representations, and had they known the true facts and concealed facts, they each would not have made such payments.

**The Foreclosure Delay Litigation**

122. Defendant Richard Sinclair prepared and filled in the names of Defendants Mauctrst and Mauchley, as plaintiffs therein, seven (7) lawsuits over the period March 22, 2000 and July 21, 2000, in the Stanislaus County Superior Court (Case Nos. 253769, 254996, 269907, 269969, 270025, 271066 and 271115), against various lenders on Lots at Fox Hollow, seeking to enjoin the foreclosures (the “Foreclosure Delay Cases”).

123. Although Defendants Richard Sinclair, Mauctrst and Mauchley succeeded in using Foreclosure Delay Cases to delay the foreclosures on the various lots without making any further payments on any of the loans, said Defendants lost six (6) of the lawsuits and settled the remaining case against GMAC involving Lots 1,11, 18 and 19 as more specifically alleged below.

**Bank One Obtains A Receiver In Early 2001 For The Fox Hollow HOA**

124. On January 30, 2001, Bank One (who had already foreclosed on Lots 5, 5 and 15), filed suit against Fox Hollow HOA, Stanislaus County Superior Court Case No. 287128, seeking a property inspection and appointment of a receiver for the Fox Hollow HOA. By order of the court, Michael McGranahan was appointed as inspector and was required to report back on February 22, 2001.

125. Mr. McGranahan received his order of appointment to conduct the inspection of the Fox Hollow HOA and Fox Hollow Property on or about February 9, 2001, and sent a letter to Defendant Richard Sinclair via telecopier enclosing the order and demanding he turn over the records of the Fox Hollow HOA. On or about February 12, 2001, Brandon Sinclair delivered to Mr. McGranahan’s office certain files and financial records for Fox Hollow HOA.

126. On or about February 13, 2001, Mr. McGranahan sent a second letter to Defendant

Richard Sinclair requesting documents and information that had not been delivered in accordance with the previous written request and court order. Despite Mr. McGranahan's request, Defendant Richard Sinclair did not provide any additional documents, and in particular, Defendant Richard Sinclair did not provide any bank statements or cancelled checks.

127. Defendant Richard Sinclair responded by fax sent to Mr. McGranahan on or about February 14, 2001 asserting in part: "The lots were created but no party ever decided to complete the task that would prepare the subdivision for sale of individual lots and the property was and continues to be operated as an apartment complex. The property changed hands many times being kept as an apartment complex in bulk."

128. Mr. McGranahan submitted his report of inspection to the court on February 22, 2001, explaining that when he inspected the property on or about February 2, 2001, the property was "in very poor condition, littered with garbage, old discarded furniture, disabled vehicles and shopping carts."

129. Mr. McGranahan also reported that according to a summary provided to him by Defendant Richard Sinclair, Defendant Mauchley had paid dues on the lots at Fox Hollow from August 2000 through February 2001, in the amount of $23,000, but: "These alleged payments are not supported by any receipts, cancelled checks or bank records."

130. Mr. McGranahan further explained that according to the information provided by Defendant Richard Sinclair, the Fox Hollow HOA paid Defendant Richard Sinclair attorney's fees in the amount of $15,266.99, paid management fees of $5,020 (including $350 to Brandon Sinclair), and paid $2,920 for insurance in which the Association was not even named as an insured. There was no accounting for the balance of $3,513.95.

131. The court, on March 22, 2001, appointed Mr. McGranahan to serve as a receiver and he did so until he was relieved by Order of the court filed April 12, 2002.

132. Mr. Rubenstein replaced Mr. McGranahan as a receiver for Fox Hollow HOA until he was released in October 2002 and the case was dismissed without prejudice on November 26, 2002.

133. The cost and expenses to the Fox Hollow HOA for the receivership proceeding included $22,609.95 for receiver's fees and $5,655.33 for the receivers' attorney's fees.

**Defendants' Fraudulent Financing Scheme Continues In 2001 With Two (2) More Loans On Lots At Fox Hollow And With Rent And Tenant Deposit Skimming On Lots That They Had Lost Through Foreclosure By Lenders**

134. On or about May 2001, Defendants Mauchley and Flake, as trustee of the Capstone Trust, entered into a settlement agreement with GMAC, of the lawsuit commenced by Mauchley and Mauctrst, Stanislaus County Superior Court Case No. 269907, in which Defendant Mauchley agreed to drop said lawsuit, and Defendant Flake, as a purported junior lien holder on Lots 1, 11, 18 and 19, agreed to purchase said lots for $114,750 each ($459,000 total) in cash, with possession of said lots "delivered to Capstone at close of escrow."

135. Defendants Richard Sinclair, Mauchley and Flake concealed from GMAC during the negotiations of said agreement, at the time said agreement was executed by the parties, and thereafter through at least July 2002, that they had agreed among themselves to use Capstone Trust as a straw buyer who would immediately upon purchase of a lot from GMAC, transfer title to such lot to Defendant Richard Sinclair in a second escrow as part of Defendant Richard Sinclair obtaining a loan against such lot in an amount substantially in excess of the amount paid to GMAC, and Defendants Richard Sinclair and Flake would split among themselves the net loan proceeds in excess of closing costs and the amount paid to GMAC.

136. Pursuant to such fraudulent scheme, Defendant Flake, as trustee of the Capstone Trust, closed escrow on the purchase of Lot 19 from GMAC on or about August 1, 2001, and then immediately conveyed title to said lot to Defendant Richard Sinclair by Grant Deed recorded on or about August 2, 2001, who simultaneously obtained a loan from Long Beach Mortgage Company, in the amount of $152,000, secured by a first deed of trust against Lot 19 that was also recorded on or about August 2, 2001, with the proceeds from such loan used to pay GMAC the purchase price of $114,750 and the closing costs, and the

balance of the net loan proceeds in the amount of approximately $31,420 distributed to Defendants Richard Sinclair and Flake.

137. Also, pursuant to such fraudulent scheme, Defendant Flake, as trustee of the Capstone Trust, closed escrow on the purchase of Lot 1 from GMAC on or about December 10, 2001, and then immediately conveyed title to said lot to Defendant Brandon Sinclair by Grant Deed recorded on or about December 10, 2001, who simultaneously obtained a loan from Decision One Mortgage Company, in the amount of $142,500, secured by a first deed of trust against Lot 1 that was also recorded on or about December 10, 2001, with the proceeds from such loan used to pay GMAC the purchase price of $114,750 and the closing costs, and the balance of the net loan proceeds of approximately $18,452.14 distributed to Defendants Richard Sinclair and Flake.

138. Pursuant to the Fox Hollow Scheme, Defendant Richard Sinclair conveyed title to Lot 19 to Lairtrust by Grant Deed recorded on or about February 4, 2002, and Defendant Brandon Sinclair conveyed title by Grant Deed to Lot 1 to Capstone LLC, also recorded on or about February 4, 2002.

139. Had Defendants Richard Sinclair and Flake disclosed the true facts to GMAC, Long Beach Mortgage Company, and Decision One Mortgage Company, GMAC would not have completed the sales of Lots 1 and 19, and Long Beach Mortgage Company and Decision One Mortgage Company would not have closed said loans.

140. While the purchase of said lots was pending, Defendant Richard Sinclair, by facsimile, sent to GMAC, on or about June 27, 2002, asked for access to the units for purposes of inspection. Unknown to GMAC, and despite said statement as well as the term in the settlement agreement that possession shall transfer upon close of escrow, Defendants Richard Sinclair, Brandon Sinclair and Mauctrst had continued to rent out and collect rents on units on Lots 1, 11, 18 and 19, following completion of the foreclosure of the same on September 29, 2000. Defendants Brandon Sinclair, Richard Sinclair and Lairtrust collected rents on said lots during times they did not own said lots, through August 1, 2001, as to Lot 19, December 10, 2001 as to Lot 1, and June 25, 2002, as to Lots 11 and 18, in an amount

according to proof at trial, all while failing to pay homeowner association dues and failing to maintain said property.

141. Defendants Richard Sinclair for Lairtrust and Capstone LLC also entered in to written leases on units 104, 133 and 135 with tenants and then refused the demands for return of first month's rent and security deposits in the amounts of $1,825, $1,850 and $1,895 respectively which such rights of the tenants have been assigned to Plaintiff CEMG.

142. Despite losing title to Lot 7 through foreclosure on June 6, 2000, Defendants Richard Sinclair and Mauctrst continued to lease out and collect rents on units on said lot in an amount according to proof at trial, until on or about February 2003, all while failing to pay homeowner association dues and failing to maintain said property.

143. With respect to Lot 19, Defendant Flake, as trustee of the Capstone Trust was the record title holder on August 1 and 2, 2001, Defendant Richard Sinclair was record title holder from August 2, 2001 to February 4, 2002, and Defendant Lairtrust LLC was record title holder from February 4, 2002 to March 14, 2004, each having accepted the deed of conveyance in which he or it became record title holder.

144. With respect Lot 1, Defendant Flake, as trustee of the Capstone Trust, was the record title holder on December 10, 2001, Defendant Brandon Sinclair was the record title holder from December 10, 2001 to February 4, 2002, and Defendant Capstone LLC was record title holder from February 4, 2002 through March 14, 2004, each having accepted the deed of conveyance in which he or it became record title holder.

**CEMG Acquires The Lots And Loans At Fox Hollow Property**

145. Plaintiff CEMG obtained fee simple title to Lots 2, 4, 5, 13 and 15 by a deed executed by Bank One, which deed was recorded on May 17, 2002, in the official records of Stanislaus County, California (the "Bank One Lots"). Plaintiff CEMG has continued up to the present time to own and control of the Bank One Lots, and all improvements located thereon.

146. Plaintiff CEMG obtained fee simple title to Lots 11 and 18, by a deed executed by

GMAC, which deed was recorded June 25, 2002, in the Official Records, Recorder of Stanislaus County, California (the "GMAC Lots"). Plaintiff CEMG has continued up to the present time to own and control the GMAC Lots, and all improvements located thereon.

147. Plaintiff CEMG obtained fee simple title to Lots 12, and 17, by deeds dated July 31, 2001, and recorded August 30, 2002, in the official records of Stanislaus County, California (the "Absher-Avanta Lots"). Plaintiff CEMG has continued up to the present time to own and control of the Absher-Avanta Lots, and all improvements located thereon.

148. On September 13, 2002, CEMG entered into a written agreement with Conti Mortgage Corporation by Fairbanks Capital, its attorney-in-fact ("Conti Mortgage"), to purchase the promissory notes and deeds of trusts for the loans recorded against Lots 3, 7, 9 and 14, on July 22, 1998, and all legal and equitable claims, known or unknown, thereunder. CEMG and Conti Mortgage entered into an amendment of such agreement on or about October 29, 2002, to include the sale of Lot 7 to CEMG.

149. CEMG completed the purchase of the loans on Lots 3 and 7, and the purchase of Lot 7 from Conti Mortgage on or about January 14, 2003. Plaintiff CEMG has continued up to the present time to own and control Lot 7, and all improvements located thereon.

150. CEMG completed the purchase of the loans on Lots 9 and 14 from Conti Mortgage, on or about May 27, 2003.

151. Plaintiff CEMG completed the foreclosures and trustees deeds upon sale were recorded on Lot 3 on May 21, 2003, on Lot 9 on May 30, 2003 and on Lot 14 on June 25, 2003. CEMG has continued up to the present time to own and control of Lots 3, 9, 14 and all improvements located thereon.

152. As part of the purchase of the notes and deeds of trust on Lots 3, 7, 9 and 14, and the purchase of Lot 7, Conti Mortgage also transferred, sold and assigned to and Plaintiff CEMG accepted from Conti Mortgage all legal and equitable claims, known or unknown, under the subject notes and deeds and trust.

153. Plaintiff CEMG obtained fee simple title to Lots 6, 8, 10 and 16, by a deed executed by Merle Alldrin, Rachel Alldrin, Gary Alldrin, and Lisa Alldrin (the "Alldrin

Lots"), which deed was recorded August 1, 2003, in the Official Records, Recorder of Stanislaus County, California. Plaintiff CEMG has continued up to the present time to own and control of the Alldrin Lots, and all improvements located thereon.

**Plaintiffs Rehabilitate Fox Hollow Property**

154. On or about September 30, 2002, Mr. Rubenstein, as receiver for the Fox Hollow HOA, provided notice of a meeting of the owners and of the board of directors of the Fox Hollow HOA for October 15, 2002.

155. At the meeting of owners for the Fox Hollow HOA on October 15, 2002, the owners elected Andrew Katakis, Gary Alldrin and Dave B. Konecny, as directors for the Fox Hollow HOA.

156. On January 10, 2003, the Fox Hollow HOA Board held a noticed meeting. The Board decided to hire professionals to assist with the problems facing Fox Hollow, including among others, a construction consultant - Todd Smith & Association - to assist in matters related to project renovation and code compliance.

157. Mr. Smith conducted an extensive inspection of the property and contacted the City of Turlock and various contractors to assess what needed to be done and the costs to do the work.

158. On July 21, 2003, the Fox Hollow HOA provided notice to the owners of a meeting on July 31, 2003. The agenda for the July 31, 2003 meeting included notice that there would need to be a special assessment and noted: "The project encompasses significant deferred maintenance issues, pending code compliance issues with the City of Turlock building department, health and safety issues and overall project beautification."

159. On July 31, 2003, the Fox Hollow HOA Board of Directors held its meeting and decided to move forward with the renovation and improvements to the common area and completing the requirements of the City of Turlock for the Project, and approved a special assessment of approximately $9,500 against each of the lots to fund the project.

160. Over the period of mid 2003 through 2004, extensive work at substantial expense was performed on the Fox Hollow Property. This work included completing the

requirements of the City of Turlock for separate ownership of the lots, and also a complete renovation of the exteriors and interiors of many of the units that were no longer habitable.

161. The outside work included among other work, installing twenty-four (24) fire walls in garages and six (6) fire walls in units, and cutting twelve (12) roof overhangs. Separate underground utilities including electricity, gas, cable, television and telephone, were also run to fifteen (15) of the units. This work was required under the original City of Turlock approval to be completed prior to recordation of the final subdivision map.

162. The total cost to the Fox hollow HOA for such work was more than $300,000.

163. Plaintiff CEMG expended a total of more than $1 million on the rehabilitation that included paying dues and special assessments to Fox Hollow for the work, as well as additional work on the units.

**Defendants Continue To Falsely Assert Ownership In And A Right Of Possession To Garage Lots And Common Area**

164. Defendants have continued and threaten to continue their misconduct as alleged herein.

165. Defendants, from and after the commencement of this action up to the present time have failed and refused to convey record clear title to the "A" Lot to Plaintiff CEMG, despite demand having been made and accordingly, Plaintiff CEMG has been prevented from obtaining approval of the subdivision through the California Department of Real Estate, and from receiving profits form selling the individual single-family residences and duplexes during on or about 2005 and 2006 at a time when market values were substantially higher than they are currently.

166. On or about June 26, 2007, Defendant Richard Sinclair caused to be recorded a quitclaim deed purportedly transferring title to Lots 2A, 6A, 7A, 8A, 9A, 10A, and 18A, from Defendant Mauchley to Defendant Lairtrust, as Instrument No. 2007-0084538-00, Official Records of Stanislaus County, California.

167. On or about April 17, 2008, Defendant Richard Sinclair as "Member/Manager for Mauctrst LLC", served by U.S. Mail on Plaintiffs and on the tenants at the Fox Hollow

Property of unit number 131 and garage lot 2A, unit number 113 and garage lot 6A, unit number 109 and garage lot 7A, unit number 111 and garage lot 7A, unit number 107 and garage lot 8A, unit number 101 and garage lot 9A, unit number 103 garage lot 9A, unit number 105 and garage lot 10A, unit number 100 and garage lot 18A, and unit number 102 and garage lot 18A, a "Notice of Termination of Tenancy/Occupancy And Use Of Premises" demanding on behalf of the owner, Defendants Mauctrst and Mauchley, or their predecessor Stanley Flake, Trustee, that such tenants and Plaintiffs remove themselves from and deliver up possession, occupancy and use of the reference garage lot, as for example "Garage Lot Unit 2A Located at 152 20th Century Blvd., Turlock, California 95380", on or before May 19, 2008, and stating that the notice is given "to terminate your tenancy, occupancy and use of the premises of the above described property."

168. Thereafter, on or about May 22, 2008, Defendant Richard Sinclair, again on behalf of Defendants Mauchley and Mauctrst, or their predecessor-in-interest, Stanley Flake, Trustee, wrote to CEMG and demanded that CEMG and its tenants vacate the garages on lots 2A, 6A, 7A, 8A, 9A, 10A and 18A, and if they failed to do so by 5:00 p.m. on May 28, 2008, unlawful detainer action would follow.

169. On or about July 2, 2008, Defendant Richard Sinclair commenced unlawful detainer actions in the names of Mauctrst and Lairtrust, in the Superior Court of California, County of Stanislaus, Case Nos. 628615 and 62852, against CEMG and its tenants for lots 9A and 2A respectively, in which Defendants Mauctrst and Lairtrust asserted they are the owners of such garage lots, and sought to evict CEMG and its tenants from such garage lots.

170. On or about August 22, 2008, pursuant to motion by CEMG in such actions, such actions were stayed pending the outcome of this action.

171. On or about April 17, 2008, Defendant Richard Sinclair as "Member/Manager for Mauctrst LLC", also served by U.S. Mail on the tenants of each of the thirty-five (35) units at Fox Hollow and on Plaintiffs, a "Notice of Termination of Tenancy/Occupancy And Use Of Premises" for the "Driveway and Common Area Located at 152 20th Century Blvd.,

Turlock, California 95380," demanding on behalf of the owner, Defendants Mauctrst and Mauchley, or their predecessor Defendant Stanley Flake, Trustee, that such tenants and Plaintiffs remove themselves from and deliver up possession, occupancy and use of the premises described above, on or before May 19, 2008, and stating that the notice is given "to terminate your tenancy, occupancy and use of the premises of the above described property."

**Count One Fraud**

172. The Plaintiffs asserting this count are Fox Hollow HOA and CEMG, and this count is being asserted against Defendants Mauctrst, Richard Sinclair, Brandon Sinclair, Mauchley, Flake, Lairtrust and Capstone LLC ("Defendants"). For purposes of this count, and this count only, "Plaintiffs" and "Defendants" shall be limited to those parties.

173. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 146 as if fully set forth herein.

174. As set forth above, Plaintiff CEMG is the assignee of all claims of Conti arising out of or related to the July 1998 loans on Lots 3, 7, 9 and 14.

175. The Defendants, and each of them, knew that said representations and promises were false at the time they were made, and Defendants, and each of them, concealed said facts and made the representations and promises with the intent to induce said lenders to make said loans and dues payments, and with the intent to defraud and deceive said lenders, including without limitation, Conti.

176. Defendants Richard Sinclair, Mauchley and Flake, commencing on or about 1995, and continuing until at least 2003 and according to proof at trial, knowingly agreed, colluded and conspired with each other and among themselves to fraudulently create the false appearance of a homeowners association and individually saleable lots at Fox Hollow in order to obtain loans secured by portions of Fox Hollow and to enrich themselves at the expense of the lenders, the successors to the lenders and the homeowners association, by skimming off loan proceeds, dues collected in the name of the homeowners association, and rental income and tenant deposits, all while concealing their scheme and attempting to

shield themselves from individual liability by creating shell companies and churning record title to the property (the "Fox Hollow Scheme").

177. Defendant Mauctrst joined in, agreed to and become a part of Fox Hollow Scheme by on or about April 1998; Defendant Lairtrust joined in, agreed to and become a part of Fox Hollow Scheme on or about May 2000; Defendant Brandon Sinclair joined, agreed to on and become a part of Fox Hollow Scheme by in or about June 2000; and Defendant Capstone LLC joined in, agreed to and become a part of Fox Hollow Scheme by on or about December 2001.

178. Defendants agreed to, participated in, aided and abetted, and committed acts in furtherance of and in pursuance to the Fox Hollow Scheme from on or about 1995 and to the present, in that, among other things: Defendant Flake, as trustee of the Julie Insurance Trust, purchased the Fox Hollow Property from Stockton Savings Bank on or about October 31, 1995, with Defendant Flake, as trustee of the F. Hanse Trust proving the funds for the purchase; Defendant Richard Sinclair contacted the architect for the Project on or about November 1995, to let him know Defendant Flake would be paying the bills; Defendant Flake met with the architect for the Project and thereafter, on or about November 18, 1995, started paying the architect for his prior work on the Project; Defendant Flake continued to pay for architectural services with respect to the Fox Hollow Subdivision including, without limitation, on December 15, 1995; Defendant Richard Sinclair assisted Defendant Flake with respect to the subdivision; Defendant Flake, as trustee of the Julie Insurance Trust, signed the final map for Fox Hollow Lots 1, 11, 18 and 19 on or about November 10, 1995; Defendant Sinclair filed an unlawful detainer proceeding on January 18, 1996, in the Stanislaus County Municipal Court, Case No. 74645, on behalf of himself and Defendant Flake, as "Owner", on unit 103 at Fox Hollow; Defendant Richard Sinclair communicated with the City of Turlock and worked with the civil engineer and architect for the Project to complete the final map for Fox Hollow Lots 1, 11, 18 and 19 and caused Fox Hollow Subdivision Map #1 to be recorded, on or about March 6, 1996; Defendant Richard Sinclair revised and Defendant Flake as trustee of the

Julie Insurance Trust, signed the Fox Hollow CC&Rs in September 1996; Defendant Richard Sinclair caused the Fox Hollow CC&Rs to be recorded, on or about September 16, 1996 and returned to “Mauctrst”; Defendant Sinclair filed an unlawful detainer proceeding on November 8, 1996, in the Stanislaus County Municipal Court, Case No. 81879, on behalf of himself and Defendant Flake, as “Owner”, on unit 109 at Fox Hollow; Defendant Richard Sinclair assisted Defendant Mauchley in obtaining financing from GMAC in or about February 1997 for the Project as more specifically alleged herein; Defendant Flake in or about February 1997 requested and received an extension of time from the City of Turlock for one year to complete various improvements on the Fox Hollow Property with respect to the subdivision; Defendant Richard Sinclair facilitated the transfer of title of the Fox Hollow Property from Defendant Flake, as trustee of the Julie Insurance Trust, to Defendant Mauchley on February 26, 1997 as more specifically alleged herein; Defendant Richard Sinclair communicated with the City of Turlock and worked with the civil engineer and architect for the Project to complete a final map for the remaining Fox Hollow lots; Defendant Mauchley signed Fox Hollow Subdivision Map # 2 on or about February 27, 1998; Defendant Richard Sinclair signed and filed limited liability company articles of organization in the name of Mauctrst LLC with the California Secretary of State on or about April 28, 1998; Defendant Richard Sinclair assisted Mr. Mauchley over the period from on or about February 1998 to on or about July 1998 in obtaining fifteen (15) loans from several lenders against lots at the Fox Hollow Property as more specifically alleged herein; Defendant Sinclair sent a facsimile to the City of Turlock on February 20, 1998, forwarding an assignment from Defendant Flake to Defendant Mauchley; Defendant Sinclair sent a letter via facsimile to Mr. Sessions of GMAC Mortgage in Hawaii, on or about May 5, 1998, providing financial information concerning Mr. Mauchley; Defendant Richard Sinclair caused Fox Hollow Subdivision Map # 2 to be filed in the Official Records of Stanislaus County, California, on July 21, 1998; Mr. Mauchley signed the loan documents for the July 1998 loans on or about July 9, 1998, including without limitation, the loan applications, promissory notes and deeds of trust that were recorded in the Official

Records of Stanislaus County, on July 22, 1998; Defendant Richard Sinclair prepared and Mr. Mauchley signed a deed conveying title to the Fox Hollow Lots 1 through 19 to Mauctrst that was recorded in the Official Records of Stanislaus County, California, on or about July 29, 1998; Defendant Sinclair prepared, filed and prosecuted unlawful detainer actions on behalf of himself and Mr. Mauchley as "Owner" in the Stanislaus County Superior Court, on unit 121 at Fox Hollow on or about October 5, 1998 (Case No. 182407), on unit 119 at Fox Hollow on February 1, 1999 (Case No. 1851990), on unit 127 at Fox Hollow on February 1, 1999 (Case No. 185201), on unit 121 at Fox Hollow on March 25, 1999 (Case No. 186532), on unit 127 at Fox Hollow on June 4, 1999 (Case No. 228301), on unit 105 at Fox Hollow on June 16, 1999 (Case No. 228676), on unit 131 at Fox Hollow on February 14, 2000 (Case No. 252225), on unit 125 at Fox Hollow on March 17, 2000 (Case No. 253689), on unit 117 at Fox Hollow on October 1, 2000 (Case No. 274533), on unit 116 at Fox Hollow on October 18, 2000 (Case No. 274549), and on unit 127 at Fox Hollow on March 6, 2001 (Case No. 288094); in September 1999 and again in December 1999, Defendant Richard Sinclair filed schedules in the Mauctrst Bankruptcy Case on behalf of Mauctrst and Mr. Mauchley, stating under penalty of perjury that Mauctrst was owned fifty percent (50%) by Defendant Mauchley and fifty percent (50%) by his spouse, when Mr. Mauchley denies his spouse had any ownership interest in Mauctrst; Defendant Richard Sinclair in the name of Mauctrst and Mauchley, filed at least six (6) lawsuits in the Stanislaus Superior Court between March 22, 2000 and July 21, 2000 (Case Nos. 253769, 254996, 269907, 270025, 271066 and 271115) and obtained preliminary relief delaying foreclosures on various lots at the Fox Hollow Property, and then lost all those case; in one of those cases (Case No. 254996), Defendant Richard Sinclair in the name of Mauctrst and Mauchley, obtained a preliminary injunction enjoining the foreclosure on lots 9 and 14, and also claimed the preliminary injunction pertained to lots 3 and 7, that was conditioned upon them making the required monthly payments on the promissory notes as they come due, and then failed and refused to make a single payment and enjoyed the benefit of the injunction until 2003; Defendant Richard

Sinclair prepared and filed with the California Secretary of State articles of organization for Defendant Lairtrust, on or about May 26, 2000; Defendant Richard Sinclair prepared documents that purported to be minutes of Fox Hollow homeowner's association board meetings over the period June through December 2000, that stated Mr. Mauchley was in attendance, when Mr. Mauchley denied attending any board meetings; Defendant Richard Sinclair and Defendant Brandon Sinclair signed a letter dated August 1, 2000 in which the Fox Hollow HOA purportedly waived any conflict of interest arising by reason of Defendant Richard Sinclair's representation of the homeowner's association while also representing Brandon Sinclair and Mr. Mauchley in other matters, including matters against lenders who were foreclosing on and owned lots at the Fox Hollow Property; Defendant Richard Sinclair and Brandon Sinclair signed and mailed out dues statements, letters and notices of delinquent assessments to lenders over the period August 1, 2000, through January 31, 2001, in the name of Fox Hollow HOA, asserting dues of $300 per month per lot were due and payable to the homeowners association; on or about May 2001, Defendant Richard Sinclair negotiated and Defendants Mauchley and Flake signed a settlement agreement with GMAC under which Defendant Flake as Trustee of the Capstone Trust, would purchase lots 1, 11, 18 and 19, and then Defendants Richard Sinclair, Brandon Sinclair and Flake set up secret double escrows and concealed material facts from GMAC and the lenders as herein alleged; Defendant Brandon Sinclair signed and Defendant Richard Sinclair caused articles of organization for Defendant Capstone LLC to be prepared and filed with the California Secretary of State on or about December 3, 2001; Defendants Richard Sinclair transferred title to Lot 19 to Lairtrust on or about February 4, 2002; Defendants Brandon Sinclair transferred title to Lot 1 to Capstone LLC on or about February 4, 2002; Defendant Richard Sinclair prepared, Defendant Mauchley executed and Defendant Richard Sinclair caused to be recorded in 2007, a deed conveying record title to the "A" lots to Defendant Lairtrust; Defendant Richard Sinclair, on behalf of Defendants Mauchley, Mauctrst and Flake sent Notices of Termination of Tenancy/Occupancy And Use Of Premises to Plaintiffs and the tenants at Fox Hollow in

April 2008, purportedly to evict them from the common area and the "A' Lots at Fox Hollow; and Defendant Richard Sinclair filed in the names of Mauctrst and Lairtrust unlawful detainer actions in state court in July 2008 to evict CEMG and its tenants from the garages on Lots 2A and 9A.

179. Defendants, and each of them, attempted to and intended to perfect and carry out the Fox Hollow Scheme so that they could continue the scheme described above, or abandon the same at any time, and all loss would fall on Bank One, GMAC, Conti, Absher-Avanta, HFC Beneficial, Plaintiffs and other lenders and members of the public who might be induced to make loans on, invest in or purchase lots and units at Fox Hollow, while Defendants retained their profits from such scheme.

180. As a proximate result of the fraudulent conduct of Defendants as hereinabove alleged, Conti Mortgage completed a foreclosure on and Lot 7 on or about June 6, 2000 for a credit bid of only $85,000 when $144,595.85 was due and owing on the loan at the time, and was thereby damaged in the amount of approximately $50,000 and according to proof at trial, and sold Lot 7 and the loans on Lots 3, 7, 9 and 14 to Plaintiff CEMG for a loss of more than $500,000 and according to proof at trial.

181. Further, Plaintiff CEMG as a proximate result of such fraudulent conduct, in addition to the claims assigned to it by Conti, was required to and did incur expenses in correcting and remedying the failure to complete the requirements for the subdivision map and otherwise rehabilitate Lots 3, 7, 9 and 14 in an amount in excess of $280,000 and according to proof at trial, and otherwise incurred expenses and lost profits relating the individual lots at Fox Hollow.

182. Further, Plaintiff Fox Hollow HOA as a proximate result of such fraudulent conduct, was required to and did: incur and pay receivers fees and receivers attorneys fees in the amount of $28,265.28, incur and pay expenses in correcting and remedying the failure to complete the requirements for the subdivision map and otherwise rehabilitate the common area in an amount in excess of $300,000 and according to proof at trial and was deprived of homeowners dues collected and retained by defendants in an amount according

to proof at trial.

183. In doing the things alleged herein, Defendants, and each of them, acted willfully and with the intent to cause injury to Bank One, GMAC, Conti, Absher-Avanta, HFC-Beneficial, Plaintiff CEMG as assignee of the claims of Conti, and Plaintiffs individually, and in conscious disregard of the rights of Bank One, GMAC, Conti, Absher-Avanta, HFC-Beneficial, Plaintiff CEMG as assignee of the claims of Conti, and Plaintiffs individually, thereby warranting an assessment of punitive damages in an amount appropriate to punish Defendants, and each of them, and to deter others from engaging in similar misconduct.

**Count Two RICO**

184. The Plaintiffs asserting this count are Fox Hollow HOA and CEMG, and this count is being asserted against Defendants Mauctrst, Richard Sinclair, Brandon Sinclair, Mauchley, Flake, Lairtrust and Capstone LLC ("RICO Defendants"). For purposes of this count, and this count only, "Plaintiffs" and "Defendants" shall be limited to those parties.

185. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 157 as if fully set forth herein.

186. As set forth above, CEMG is the assignee of all claims of Conti arising out of or related to the loans on the Conti Lots.

187. At all relevant times, Defendants Mauchley, Richard Sinclair, Flake, Brandon Sinclair were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(c).

188. At all relevant times herein from and after April 28, 1998, Defendant Mauctrst was a "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

189. At all relevant times from and after December 6, 2000, Fox Hollow HOA was the "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c), and an "enterprise" within the meaning of RICO, 18 U.S.C. § 1961(4).

190. At all relevant times from and after May 26, 2000, Defendant Lairtrust was a "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

191. At all times relevant herein from at least on and after December 3, 2001, Defendant

Capstone LLC was a "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

192. At all times relevant herein from and after on or about 1995, Defendants Richard Sinclair, Mauchley and Flake formed an association-in-fact to own and operate Fox Hollow and divide among themselves money and benefits derived therefrom. This association-in-fact was an "enterprise" within the meaning of RICO, 18 U.S.C. § 1961(4).

193. At all times relevant herein from and after April 1998, Defendant Mauctrst joined said association-in-fact. This association-in-fact was an "enterprise" within the meaning of RICO, 18 U.S.C. § 1961(4).

194. At all times relevant herein from and after May 2000, Defendant Lairtrust joined said association-in-fact. This association-in-fact was an "enterprise" within the meaning of RICO, 18 U.S.C. § 1961(4).

195. At all times relevant herein from and after June 2000, Defendant Brandon Sinclair joined said association-in-fact. This association-in-fact was an "enterprise" within the meaning of RICO, 18 U.S.C. § 1961(4).

196. At all times relevant herein from and after December 2001, Defendant Capstone LLC joined said association-in-fact. This association-in-fact was an "enterprise" within the meaning of RICO, 18 U.S.C. § 1961(4).

197. At all relevant times, said enterprises were engaged in, and their activities affected, interstate and foreign commerce, within the meaning of RICO, 18 U.S.C. § 1962(c).

198. The RICO Defendants, for purposes of executing such scheme and artifice to defraud and for obtaining money, loans and property by means of a false or fraudulent pretense, representation and promise, and attempting to do so, transmitted and caused to be transmitted by means of wire communications in interstate or foreign commerce writings and signals ("Wiring"), and also deposited, caused to be deposited and authorized the following materials and things to be placed in any post office or authorized depository, or deposited or caused to be deposited the following matters or things to be sent or delivered by private or commercial interstate carrier ("Mailing"): Wiring and/or Mailing loan

applications and other loan documents for the February 1997 loans; Wiring and/or Mailing demands for payments into the escrows relating to the February 1997 loans; causing the funds from the lender to be Wired or Mailed into and disbursed from the five (5) escrows for the February 1997 loans; Wiring and/or Mailing the loan applications and other loan documents for the July 1998 loans; Wiring and/or Mailing demands for payments into the escrows relating to the July 1998 loans; causing the funds to be Wired and/or Mailed into and disbursed from the fifteen (15) escrows for each of the July 1998 loans; Mailing dues statements to the lenders over the period of August through December 2000 as hereinabove alleged; Mailing the notices of delinquent assessment to the lenders on or about December 19, 2000 and on or about January 22, 2001, as hereinabove alleged; Wiring and/or Mailing the settlement agreement with GMAC as herein alleged; Wiring and/or Mailing the loan application and other loan documents relating to the loan on Lot 19 that closed on or about August 2, 2001, and on Lot 1 that closed on or about December 10, 2001; Wiring and/or Mailing demands for payments into the escrows relating to the loan on Lot 19 that closed on or about August 2, 2001, and on Lot 1 that closed on or about December 10, 2001; causing the funds to be to be Wired or Mailed into and disbursed from the escrow for the loan on Lot 19 on or about August 2, 2001 and for the loan on Lot 1, on or about December 10, 2001.

199. At all times relevant herein, RICO Defendants conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961(5), in violation of RICO, 18 U.S.C. § 1962(c).

200. Specifically, at all relevant times, RICO Defendants engaged in "racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961(1), by engaging in the acts set forth above. The acts set forth above constitute a violation of one or more of the following statutes: 18 U.S.C. § 1341 (mail fraud); and 18 U.S.C. § 1343 (wire fraud). RICO Defendants each committed and/or aided and abetted the commission of two or more of these acts of racketeering activity.

201. The acts of racketeering activity referred to in the previous paragraph constitute a "pattern of racketeering activity", within the meaning of 18 U.S.C. § 1961(5). The acts alleged were related to each other by virtue of common participants, common victims and a common method of commission, and the common purpose and common result of defrauding the lenders and Fox Hollow HOA and enriching the Defendants at the expense of the lenders and Fox Hollow HOA while concealing Defendants fraudulent activity.

202. At all relevant times, the RICO Defendants each were associated with the enterprise and agreed and conspired to violate 18 U.S.C. § 1962(c), in that they agreed to conduct and participate, directly and indirectly, in the conduct of affairs of the enterprise through a pattern of racketeering activity, as alleged herein, in violation of 18 U.S.C. § 1962(d).

203. The RICO Defendants committed and caused to be committed a series of overt acts in furtherance of such conspiracy and to affect the objects thereof, including but not limited to the acts set forth above.

204. As a result of RICO Defendants' violations of 18 U.S.C. §§ 1962(c) and (d) and each of them, the Fox Hollow HOA incurred expenses and has been damaged as herein alleged in an amount according to proof at trial, including, but not limited to, receivers fees and receivers attorneys fees, expenses in correcting and remedying the failure to complete the requirements for the subdivision map and otherwise rehabilitating the property, and for homeowners dues collected and retained by defendants.

205. As a result of RICO Defendants' violations of 18 U.S.C. §§ 1962(c) and (d) and each of them, Plaintiff CEMG has incurred expenses and been damaged as alleged herein, and according to proof at trial, including, but not limited to, losses suffered by Conti on the foreclosure on Lot 7 and on the sale of loans on Lots 3, 7, 9 and 14 to CEMG, the costs and expenses incurred in correcting and remedying the failure to complete the requirements for the subdivision map and otherwise rehabilitate Lots 3, 7, 9 and 14, loans made to Fox Hollow HOA to cover a portion of the fees and expenses incurred by it as a result of the conduct of Defendants as alleged herein, expenses incurred and profits lost

relating the individual lots at Fox Hollow, and the payments of deposits to tenants that Defendants wrongfully withheld.

206. Pursuant to RICO, 18 U.S.C. § 1964(c), Fox Hollow HOA and CEMG are entitled to recover three-fold their damages plus costs and attorneys' fees from the RICO Defendants.

**Count Three Unjust Enrichment**

207. The Plaintiffs asserting this count are Fox Hollow HOA and CEMG, and this count is being asserted against Defendants Mauctrst, Richard Sinclair, Brandon Sinclair, Mauchley, Flake, Lairtrust and Capstone LLC. For purposes of this count, and this count only, "Plaintiffs" and "Defendants" shall be limited to those parties.

208. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 157 as if fully set forth herein.

209. As a result of the conduct of Defendants, they have been unjustly enriched at the expense of Plaintiffs and the law thereby implies a contract by which Defendants must pay to Plaintiffs the amount by which, in equity and good conscience, the Defendants have been unjustly enriched at the expense of Plaintiffs.

**Count Four Accounting**

210. The Plaintiffs asserting this count are Fox Hollow HOA and CEMG, and this count is being asserted against Defendants Mauctrst, Richard Sinclair, Brandon Sinclair, Mauchley, Flake, Lairtrust and Capstone LLC. For purposes of this count, and this count only, "Plaintiffs" and "Defendants" shall be limited to those parties.

211. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 157 as if fully set forth herein.

212. Defendants, as alleged herein, collect dues and assessments on behalf of the homeowners association, paid themselves funds rightfully belonging to the homeowners association, and collected rents and deposits from tenant of units at Fox Hollow at times when such Defendants did own the units.

213. The amount of money due from Defendants to Plaintiffs is unknown to Plaintiffs

and cannot be ascertained without an accounting of such dues, assessments, payments, rents and deposits.

**Count Five Constructive Trust Re: Garage Lots**

214. The Plaintiff asserting this count is CEMG, and this count is being asserted against Defendants Richard Sinclair, Mauctrst, Mauchley, Lairtrust and Flake, Trustee. For purposes of this count, and this count only, "Plaintiff' and "Defendants" shall be limited to those parties.

215. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 157 as if fully set forth herein.

216. The lenders who made the February 1997 loans and July 1998 loans commissioned appraisals of the unit or units identified in each loan application, and received appraisals listing each unit as having a one car garage.

217. On or September 15, 1998, Defendant Mauctrst filed with the California Department of Real Estate a Notice of Intention (Common Interest) on Fox Hollow of Turlock ("Notice"). The Notice, at page 3, Section 2.L, provides that the improvements at Fox Hollow of Turlock will contain one "1 car garage for each residential unit, and common area parking spaces."

218. The legal description in the deeds of trust executed by Defendant Mauchley for the February 1997 and July 1998 loans were prepared, at least in part, by employees of the title company retained in connection with each particular transaction and were ambiguous in that they included the unit number or numbers as a description of the property and also included a lot number for Lots 2, 6, 7, 8, 9, 10 and 18 without including the "A" lot for the corresponding one garage for the unit or units described in the deed of trust.

219. Defendant Mauchley, by virtue of applying for such loans based upon unit numbers and under the circumstances as alleged herein, agreed either expressly or impliedly to include as collateral for and is estopped from denying that the collateral for such loans did not include, the corresponding one-car garage for each unit.

220. The failure to include the corresponding "A" lot in the legal descriptions in said

deeds of trust and therefore in the trustee's deeds upon the foreclosures under said deeds of trust was the result of the mutual mistake of the parties, the unilateral mistake of the lender that was known or should have been know by Defendants and/or the fraud of Defendants.

221. By virtue of the agreement to include the corresponding garage for each unit as collateral and/or the mistake and/or fraud as herein alleged, Defendants hold such "A" lots as constructive trustee for Plaintiff's benefit.

**Count Six Declaratory And Injunctive Relief Re: Garage Lots**

222. The Plaintiff asserting this count is CEMG, and this count is being asserted against Defendants Richard Sinclair, Mauctrst, Mauchley, Lairtrust and Flake, Trustee. For purposes of this count, and this count only, "Plaintiff" and "Defendants" shall be limited to those parties.

223. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 157 as if fully set forth herein.

224. An actual controversy has arisen and now exists between Plaintiff and Defendants in that Plaintiff contends that Plaintiff CEMG is entitled to and Defendants are estopped from claiming ownership in and the right of possession to the "A" Lots, whereas Defendants contend that they own and have a right of possession to the "A" Lots to the exclusion of Plaintiff CEMG and its tenant at Fox Hollow.

225. Plaintiffs request a declaratory judgment, declaring the rights and obligations of the parties with respect to the "A" Lots at Fox Hollow, and declaring that Plaintiff CEMG is entitled to ownership in and the right of possession to the "A" Lots to the exclusion of Defendants and each of them.

226. A judicial declaration is necessary and appropriate at this time under the circumstances such that the parties herein will know their rights in and to the "A" Lots and in order to avoid a multiplicity of actions and the disruption of the peaceable use and enjoyment of the "A" Lots by Plaintiff CEMG and it tenants at the Fox Hollow Property.

227. Defendants have and threaten to continue to claim ownership in the "A" Lots at the Fox Hollow Property and to harass the tenants thereon, and accordingly, an injunction

should issue enjoining and restraining Defendants and each of them from asserting, claiming or communicating to tenants at the Fox Hollow Property that they, or any of them, hold or claim any ownership in and to such any such "A" Lots, or otherwise to interfere with the use and enjoyment of such "A" Lots by Plaintiffs and any tenants at Fox Hollow.

**Count Seven Fox Hollow HOA Claim For Delinquent Assessments, Late Charges, And Interest**

228. The Plaintiff asserting this count is Fox Hollow HOA, and this count is being asserted against Defendants Mauctrst, Richard Sinclair, Mauchley, Stanley Flake as Trustee of the Capstone Trust, Brandon Sinclair, Lairtrust and Capstone LLC. For purposes of this count, and this count only, "Plaintiff" and "Defendants" shall be limited to those parties.

229. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 146 as if fully set forth herein.

230. At the times herein mentioned from and after September 6, 1996 and through February 2004, the Fox Hollow CC&Rs were in effect in accordance with their terms.

231. The covenants, conditions and restrictions contained in the Fox Hollow CC&Rs constitute equitable servitudes under Civil Code section 1354 that inure to the benefit of, and are binding on, all owners of lots within the development and the association, including Plaintiff and Defendants.

232. In or about August 2000, Defendants Richard Sinclair, Mauchley and Brandon Sinclair purportedly as the board for the homeowners association: (1) levied a regular monthly assessment in the amount of $300 on each lot of the Fox Hollow Property for the purpose of "paying the joint bills of the Homeowners Association and to begin to gather and prepare to comply with all the requirements so that the property could be operated" and adopted the Fox Hollow of Turlock Owners' Association Delinquent Assessment Collection Policy, that provided that assessments were due and payable on the first day of each month of each year and become delinquent if not paid on or before the 15th day of

each month, that if a regular or special assessment becomes delinquent, a late charge equal to the greater of $10.00 or ten percent (10%) of the delinquent amount shall be charged, and interest at a rate of twelve percent (12%) per annum shall be assessed against all delinquent assessments, late charges and reasonable costs of collection commencing thirty (30) days after the due date of the delinquent assessment.

233. Mr. McGranahan, as receiver for the Fox Hollow HOA, on or about August 15, 2001, approved the Fox Hollow HOA Delinquent Assessment Collection Policy that provided that all assessments were due and payable on the first day of each month of each year and become delinquent if not paid on or before the thirtieth (30th) day of each month of each year, a late charge equal to the greater of $10.00 or ten percent (10%) of the delinquent amount shall be charged, and that interest at a rate of twelve percent (12%) per annum shall be assessed against all delinquent assessments, late charges and reasonable costs of collection commencing thirty (30) days after the due date of the delinquent assessment.

234. Pursuant to Article V, Section 1 of the Fox Hollow CC&Rs each assessment, together with interest, attorneys fees and costs of collection, shall also be a separate, distinct and personal obligation (debt) of the Owner of a Lot at the time when the assessment is levied.

235. Pursuant to Article V, Section 1, the declarant and each Owner vested in the Association the right to bring all actions for the collection of assessments.

236. Pursuant to Article IV, Subsection 2.5, the Board is empowered and obligated to enforce the provisions of the Fox Hollow CC&Rs as well as the Bylaws and Rules for the Association.

237. The Defendants named in this claim failed and refused to pay regular and special assessment to Fox Hollow HOA and owe the following amounts for assessments and late charges for their respective property interests set forth below, plus interest on such amounts at a rate of twelve (12) % per annum from thirty (30) days after each assessment and late charge was due, and until paid: Defendants Mauctrst, Richard Sinclair and

Mauchley in the amount of $49,305.14 on Lots 1 through 19 prior to the foreclosures by the lenders; Defendants Brandon Sinclair and Capstone LLC in the amount of at least $15,730 on Lot 1; and Defendants Richard Sinclair and Lairtrust LLC in the amount of at least $16,930 on Lot 19.

**Count Eight Specific Performance Re: Common Area**

238. The Plaintiff asserting this count is the Fox Hollow HOA, and this count is being asserted against Defendants Richard Sinclair, Mauchley, Mauctrst and Flake, Trustee. For purposes of this count, and this count only, "Plaintiff" and "Defendants" shall be limited to those parties.

239. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 146 as if fully set forth herein.

240. The consideration of the mutual benefits and burdens for the declarant and Owners set forth in the Fox Hollow CC&Rs was fair and reasonable at the time the Fox Hollow CC&Rs were recorded and at the times Defendants recorded the subdivision maps, conveyed and accepted title to various Lots at Fox Hollow and obtained the loans secured by Lots at the Fox Hollow Property, all as alleged hereinabove.

241. Plaintiff has performed all of the conditions, covenants and promises required of it on its part to be performed in accordance with the Fox Hollow CC&Rs for Defendants and each of them to be obligated to convey title to the common area for the Fox Hollow Property to the Fox Hollow HOA, except as excused by Defendants' failure to satisfy conditions precedent and prior breaches waived by Defendants, and for which Defendants are estopped from asserting.

242. On or about March 20, 2003, Fox Hollow HOA made written demand on Defendants to execute and deliver to the Fox Hollow HOA in recordable form, a deed conveying title to the common area of the Fox Hollow Property that was described by the legal description for the Fox Hollow Property, excepting out the Lots shown on Fox Hollow Subdivision Map # 1 and Fox Hollow Subdivision Map # 2 (the "Fox Hollow Common Area").

243. Defendants, and each of them, at all times alleged herein were obligated to convey title to the Fox Hollow Common Area to the Fox Hollow HOA under the Fox Hollow CC&Rs as hereinabove alleged, but have failed and refused to do so and thereby breached the Fox Hollow CC&Rs.

Count Nine Declaratory And Injunctive Relief Re: Common Area

244. The Plaintiffs asserting this count are Fox Hollow HOA and CEMG, and this count is being asserted against Defendants Richard Sinclair, Mauchley, Mauctrst, and Flake, Trustee. For purposes of this count, and this count only, "Plaintiffs" and "Defendants" shall be limited to those parties.

245. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 146 and 215 through 218 as if fully set forth herein.

246. Defendant Flake, as trustee of the Julie Insurance Trust, despite being obligated to do so, failed and refused to form a homeowners association for the Fox Hollow Property and to convey title to the common area for the Fox Hollow Property to the Fox Hollow HOA at any time from and after filing Fox Hollow Subdivision Map # 1 in March 1996 and conveying title of Lots 1, 11, 18 and 19 to Defendant Mauchley on or about February 26, 1997, and up to the present time.

247. An actual controversy has arisen and now exists between Plaintiffs and Defendants in that Plaintiffs contend that Plaintiff Fox Hollow HOA is entitled to ownership in and the right of possession to the Fox Hollow Common Area, whereas Defendants contend that they own and have a right of possession to the Fox Hollow Common Area to the exclusion of Plaintiffs and the tenants of CEMG at the Fox Hollow Property.

248. Plaintiffs request a declaratory judgment, declaring the rights and obligations of the parties with respect to the Fox Hollow Common Area, and declaring that Plaintiff Fox Hollow HOA is entitled to ownership in and the right of possession to the Fox Hollow Common Area and that Defendants and each of them have no ownership of or right to exclude Plaintiffs and the tenants of CEMG at the Fox Hollow Property from the Fox Hollow Common Area.

249. A judicial declaration is necessary and appropriate at this time under the circumstances such that the parties herein will know their rights in and to the Fox Hollow Common Area and in order to avoid a multiplicity of actions and the disruption of the peaceable use and enjoyment of the Fox Hollow Common Area by Plaintiffs and the tenants of CEMG at the Fox Hollow Property.

250. Defendants have and threaten to continue to claim ownership in the Fox Hollow Common Area and to harass the tenants of CEMG at the Fox Hollow Property, and accordingly, an injunction should issue enjoining and restraining Defendants and each of them from asserting, claiming or communicating to tenants at the Fox Hollow Property that they, or any of them, hold or claim any ownership in and to the Fox Hollow Common Area, or otherwise from interfering with the use and enjoyment of the Fox Hollow Common Area by Plaintiffs and any tenants at the Fox Hollow Property.

**III. Findings of Fact from the Prove Up Hearing**

251. On September 13, 2002, Plaintiff CEMG purchased Lots 3, 7, 9, and 14 from Conti for $61,250 each. Ex. 11, pages 3 and 4. The price of Lots 9 and 14 were reduced to $52,500 in light of legal challenges raised by Defendants. Doc. 1237, Transcript, 31:32-33:5. Ex. 11, Addendum.

252. The amount owing on the loans at the time Conti sold them was $193,678.11 for Lot 3, $144,595.85 for Lot 7, $199,995.14 for Lot 9, and $199,370.55 for Lot 14. Exs. 13, 14, and 15; Doc. 1237, Transcript, 34:17-36:6. Conti suffered a total loss of $510,139.65 due to selling the loans for less than the outstanding loan balance. Ex. 16; Doc. 1237, Transcript, 36:18-37:14.

253. In order for the subdivision of Fox Hollow to be approved by the City of Turlock, improvements had to be made, including "installing twenty-seven (27) firewalls for the garages, three (3) fire walls in the units, eliminating six (6) roof overhangs, removing seven (7) windows, and adding two (2) roof vents." Doc. 410, CAC, ¶¶ 35-38. Plaintiffs hired architect Vernon Fergel to determine what needed to be done on Fox Hollow to

permit subdivision. Doc. 1237, Transcript, 48:11-21. The building code analysis by Fergel recommended installing firewalls for garages, installing firewalls for certain units, eliminating certain roof overhangs, and checking or adding smoke detectors. Ex. 18.

254. The physical condition of the Fox Hollow project, both structures and grounds, in late 2002 was poor. Ex. 17; Doc. 1237, Transcript, 38:1-46:19. In rehabilitating its Lots, Plaintiff CEMG, substantially replaced the interior of the buildings, leaving only the foundations, studs, and sheetrock. Doc. 1237, Transcript, 50:17-23.

255. The total cost of rehabilitating was $75,068.08 for Lot 3, $69,348.75 for Lot 7, $78, 781.16 for Lot 9, and $68,955.14 for Lot 14 for a total of $292.153.13. Ex. 20; Doc. 1237, Transcript, 53:16-54:5.

256. Plaintiff Fox Hollow HOA rehabilitated the common areas. Doc. 1237, Transcript, 49:12-50:6. Plaintiff Fox Hollow HOA spent a total of $350,110.95 in 2003 and 2004 on these projects. Doc. 1237, Transcript, 80:4-82:7; Exs. 24-25.

257. Plaintiff CEMG planned to sell the Lots after remodeling them. Doc. 1237, Transcript, 58:1-3. However, California's Department of Real Estate would not give the necessary approval because "one of the issues had to do with the common ownership of the - - the road. And there was some garage lots that were retained by Mr. Sinclair's group, so he basically held those captive. Therefore, not allowing us to finalize the DRE white report." Doc. 1237, Transcript, 58:6-20; See Ex. 36. The dispute over ownership of the common areas and the garage lots prevented the Lots from being sold to the general public.

258. Katakis estimates that had the issues with ownership of the garage lots and the common areas not arisen, Plaintiff CEMG would have been able to get approval from the Department of Real Estate within weeks and been able to sell the units on the Lots from "very late 2004, all the way into mid 2005." Doc. 1237, Transcript, 61:17-25. Katakis states that the real estate market for condominium units in the Turlock area was very favorable to sellers in late 2004, early 2005. Doc. 1237, Transcript, 62:10-19.

259. Plaintiff CEMG had a real estate appraisal of their Fox Hollow Lots done in 2004. The report of December 12, 2004 by W.G. Bartha & Associates estimated that the Lots

would sell for a total of $6,350,000. Ex. 37. Katakis estimated that in that time frame, each duplex was worth $410,000 and each single family unit was worth $205,000 for a total of $6,355,000. Doc. 1237, Transcript, 66:8-19; Ex. 38, page 2. In contrast, Katakis estimated that as of May 28, 2015, each duplex was worth $253,746.91 and each single family unit was worth $141,751.25 for a total of $3,977,710.47. Doc. 1237, Transcript, 66:20-67:5; Ex. 38, page 1. After taking into the cost of marketing and actual sales, Katakis estimates that Plaintiff CEMG lost $2,353,516.63 in not being able to sell the Lots in 2004-2005. Doc. 1237, Transcript, 67:19-25. Delay in the sale of the Lots cost Plaintiff CEMG $2,353,516.63.

260. Lawrence Rubenstein and Michael McGranahan were appointed Receivers for Plaintiff Fox Hollow HOA from March 2001 to October 2002. Doc. 410, CAC, ¶¶ 106-107. They, and their attorneys, charged Plaintiff Fox Hollow HOA a total of $28,277.28 for their services. Doc. 1237, Transcript, 25:24-26:2; Exs. 4, 5, 6, and 8.

261. Plaintiff Fox Hollow HOA, before its incorporation, paid Defendant Richard Sinclair $15,266.99 in attorney's fees between August 2000 and January 2001. Ex.7, McGranahan Report, page 4, Exs. A and C. During this time Lender GMAC paid $5,200 to this entity. Doc. 1237, Transcript, 28:5-19.

262. Plaintiffs reached a settlement with Defendant Mauchley. Doc. 1237, Transcript, 68:21-22. To settle the CAC part of their dispute, Defendant Mauchley agreed to transfer to Plaintiffs three pieces of property worth a total of $460,000 and a $50,000 promissory note. Ex. 42. Katakis stated that the promissory note is worthless as it was discharged in bankruptcy. Doc. 1237, Transcript, 70:19-25. The total amount set aside to settle the claims contained in the CAC is $460,000.

263. Plaintiffs reached a settlement with Flake Defendants. Doc. 1179. To settle the CAC part of their dispute these Defendants agreed to pay Plaintiffs $2,625,000 (70% of the total settlement amount of $3,750,000). Doc. 1237, Transcript, 72:8-10. Katakis stated that a part of that amount was spent on attorney's fees, leaving $2,297,793 to settle the substantive claims contained in the CAC. Doc. 1237, Transcript, 72:11-73:5; Ex. 44.

**IV. Motion for Reconsideration**

264. Defendant Richard Sinclair sought to file 108 Exhibits in support of his opposition to the motion for default judgment. However, they were submitted late, on May 3, 2016, one week before the prove up hearing. Defendant Richard Sinclair also filed an ex parte motion to postpone the hearing for 90 as his license had been suspended until the end of May. Doc. 1217. The motion was denied and Defendant Richard Sinclair was directed to find alternative transportation. Doc. 1219. On the morning of the hearing, Defendant Richard Sinclair called the court seeking to participate telephonically; his request was denied. The lateness of the filing, together with Defendant Richard Sinclair's absence at the hearing, resulted in the striking of his declaration and exhibits. Doc. 1220

265. Defendant Richard Sinclair filed a motion for reconsideration, asserting that there were "new or different facts and circumstances." Doc. 1222, Motion for Reconsideration, 1:23-25. The substance of the briefing does not follow through on that assertion. Instead of presenting new facts explaining why his submissions were late and why he failed to attend the hearing, Defendant Richard Sinclair continues to focus his argument on why this court must honor the earlier settlement agreement the state courts have found unenforceable, how Andrew Katakis has orchestrated a criminal conspiracy against him, and how Plaintiffs' counsel must be disqualified. See Doc. 1223. These arguments have been consistently rejected by this court for years. See, e.g. Doc. 642 (denying motion to disqualify Plaintiffs' counsel), Doc. 860 (denying motion to disqualify Plaintiffs' counsel), Doc. 1184 (refusing to reinstate settlement agreement that the California courts have determined unenforceable and refusing to find that Plaintiffs perpetrated fraud on the courts in the State Court Action). Without any concrete, detailed explanations for why he did not file his exhibits in a timely manner and failed to show up at the prove up hearing, Defendant Richard Sinclair's motion for reconsideration is denied.

/ / /

**V. Conclusions of Law**

266. This court has jurisdiction over this action based on 28 U.S.C. § 1331 federal question jurisdiction and 28 U.S.C. § 1367(a) supplemental jurisdiction.

267. Factors which may be considered by courts in exercising discretion as to the entry of a default judgment include: (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits. Eitel v. McCool, 782 F.2d 1470, 1471–72 (9th Cir. 1986).

268. "Upon the entry of default, well-pleaded factual allegations regarding liability are taken as true, but allegations regarding the amount of damages must be proven. Pope v. United States, 323 U.S. 1, 65 S. Ct. 16, 22, 89 L. Ed. 3, 102 Ct. Cl. 846 (1944); see also Geddes v. United Financial Group, 559 F.2d 557, 560 (9th Cir. 1977); Domanus v. Lewicki, 742 F.3d 290, 303 (7th Cir. 2014) ("Any allegations in the complaint relating to liability are considered true, but allegations going to damages are not"). In addition, 'necessary facts not contained in the pleadings, and claims which are legally insufficient, are not established by default.' Cripps v. Life Ins. Co. of North Am., 980 F.2d 1261, 1267 (9th Cir. 1992) (citing Danning v. Lavine, 572 F.2d 1386, 1388 (9th Cir. 1978))." Anderson v. Riverwalk Holdings, Ltd., 2016 U.S. Dist. LEXIS 174477, *2-3 (E.D. Cal. Dec. 15, 2016).

269. Plaintiffs have stated that "Both Mr. Sinclair and Brandon Sinclair are adults and neither is subject to any legal determination of incompetence….Neither Mr. Sinclair nor Brandon Sinclair is subject to the Servicemen Civil Relief Act." Doc. 1205, Durbin Declaration, 2:17-21.

**A. Sufficiency Of The Claims**

270. In the CAC, Plaintiffs have raised claims of fraud; civil RICO; unjust enrichment;

accounting; and breach of the Fox Hollow Covenants, Conditions, and Restrictions ("CC&Rs"). For damages, Plaintiffs seek money, constructive trust, specific performance, declaratory relief, and injunctive relief. See Doc. 410, CAC, ¶¶ 147-225.

271. In the motion for default judgment (Doc. 1203) and proposed FOFCOL (Doc. 1226-1), Plaintiffs only address some of the counts included in the CAC. The court finds that Plaintiffs intended them to be support for the actual causes of action prosecuted.

272. First, Plaintiffs do not treat the fraud claim as an independent cause of action. In fact, rather than discuss fraud as a claim under California law, Plaintiffs instead discuss the fraud allegations in the context of mail and wire fraud which constitute predicate acts under RICO. See Doc. 1203, Motion, 19:5-26:19. Plaintiffs do not seek any damages from fraud independent of RICO. See Doc. 1226-1, Proposed FOFCOL. Consequently, the court need not rule on the sufficiency of the fraud cause of action.

273. Similarly, in later filings, Plaintiffs have not treated their accounting claim as a separate cause of action. California courts have recognized that rather than being a truly independent claim "the nature of a cause of action in accounting is unique in that it is a means of discovery." Teselle v. McLoughlin, 173 Cal. App. 4th 156, 180 (Cal. App. 3d Dist. 2009). Consequently, the court need not rule on the sufficiency of the accounting cause of action.

**1. RICO**

274. "[P]leading requirements should be enforced strictly when default judgments are sought under RICO. Not only is the monetary penalty for failure to answer greatly enhanced by the provisions for treble damages, but a defendant's reputation may be stigmatized." Alan Neuman Productions, Inc. v. Albright, 862 F.2d 1388, 1393 (9th Cir. 1988), citations omitted. In light of this admonition, Plaintiffs' RICO claim is read narrowly to focus on the more specific factual assertions.

275. Plaintiffs summarize the nature of the RICO claim as Defendants "knowingly agreed, colluded and conspired with each other and among themselves to fraudulently

create the false appearance of a homeowners association and individually saleable lots at Fox Hollow in order to obtain loans secured by portions of Fox Hollow and to enrich themselves at the expense of the lenders, the successors to the lenders and the homeowners association, by skimming off loan proceeds, dues collected in the name of the homeowners association, and rental income and tenant deposits, all while concealing their scheme and attempting to shield themselves from individual liability by creating shell companies and churning record title to the property." Doc. 410, CAC, ¶ 151. The specific actions Plaintiffs cite as constituting the heart of the RICO claim are set out in detail in Paragraph 153. Doc. 410, CAC, ¶ 153.

276. One part of the scheme was obtaining mortgages for the various Fox Hollow lots in 1997-98 while making misrepresentations and withholding material information from the lenders. To borrow the money, Defendants created the false appearance of an arms length transaction between Defendants Flake and Mauchley. Doc. 410, CAC, ¶ 52. The Fox Hollow CC&Rs were executed and recorded on September 16, 1996 by Defendants Flake and Richard Sinclair. Doc. 410, CAC, ¶ 44. It spelled out the operation and rules of the Fox Hollow HOA. Doc. 410, CAC, ¶¶ 45-50. In particular, it required transfer to the HOA of "fee title to the common area for the Fox Hollow Property free and clear of all liens and encumbrances 'prior to the conveyance of title to the first lot.'" Doc. 410, CAC, ¶ 49. The deeds of trust for these mortgages also included a Planned Unit Development Rider which specified that the loan also included an interest in the HOA and that Defendant Mauchley as the borrower promised to abide by the articles of incorporation of the HOA. Doc. 410, CAC, ¶¶ 57 and 69. The mortgages were conditioned upon the Lots being individually saleable. Doc. 410, CAC, ¶ 63. However, Defendants did not incorporate the Fox Hollow HOA until December 6, 2000. Doc. 410, CAC, ¶ 95. There is still a cloud over the title of the common areas as Defendants refused to transfer them to Fox Hollow HOA. At the time Defendant Mauchley obtained the loans "there was no homeowners association or equivalent entity to own or manage the common area and facilities of the PUD; title to the common area had not been transferred to a homeowners association; and Defendants

Richard Sinclair, Mauchley and Flake, and each of them, had no intention at that time to form a homeowners association, to transfer title to the common area, or to charge and collect dues and assessment to maintain the common area and lots, all as required of them in the Fox Hollow CC&Rs and by the conditions of approval by the City of Turlock for the Project." Doc. 410, CAC, ¶¶ 58 and 70. Plaintiffs allege that Defendants concealed these facts from the Lenders. Doc. 410, CAC, ¶ 58. In obtaining the loans, Defendants used mails and/or interstate phone calls or electronic communications. Doc. 410, CAC, ¶ 173. Properties on a Fox Hollow development that did not have an HOA and have been subdivided to be individually saleable are worth less than properties in a project that have those tasks completed. Defendants were aware that whether a Lot was individually saleable was an important distinction in determining the worth of the Properties. In 2000, Defendants sent the Lenders letters through the mail that revealed these problems in a bid to buy back the deeds of trust from the Lenders for less than the amount outstanding on the loans. Doc. 410, CAC, ¶¶ 77 and 85. By misrepresenting the state of the Fox Hollow development when initially obtaining the mortgages, Defendants defrauded the Lenders. A related matter is ownership of the garages associated with the Lots. In obtaining the mortgages, Defendants "concealed from each of the lenders that the corresponding one car garages" for Lots 2, 6, 7, 8, 9, 10, and 18 were "not included in the legal description in the deed of trust for the loan." Doc. 410, CAC, ¶¶ 59 and 71. Again, this would act to decrease the value of the Lots. Defendants continue to use the state of subdivision and question over title to the garages to frustrate Plaintiff CEMG's attempts to sell the Lots it owns.

277. Another part of the scheme involved misusing the name of Fox Hollow HOA to fraudulently obtain money from the Lenders. The Lenders (and their successors) foreclosed on the various Fox Hollow Lots in 2000-2003. Doc. 410, CAC, ¶ 89. Yet starting on August 1, 2000 (before the HOA's incorporation), Defendants Richard Sinclair, Mauchley, and Brandon Sinclair represented themselves as the Board of Directors of the Fox Hollow HOA and through the mail demanded monthly dues of $300 upon the Lenders

who successfully foreclosed. Doc. 410, CAC, ¶ 90. GMAC paid the amounts Defendants, representing themselves as Fox Hollow HOA, demanded. Doc. 410, CAC, ¶ 96.

278. "Any person injured in his business or property by reason of a violation of section 1962 of this chapter [18 U.S.C. § 1962] may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." 18 U.S.C. § 1964(c). Plaintiffs assert that Defendants' actions violated 18 U.S.C. § 1962(c) and (d). Doc. 410, CAC, ¶ 180. Under federal RICO law, "(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(c) and (d). "To state a claim under § 1962(c), a plaintiff must allege '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" Odom v. Microsoft Corp., 486 F.3d 541, 547 (9th Cir. 2007), citations omitted.

279. An "'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "[A]n association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." Boyle v. United States, 556 U.S. 938, 946 (2009). "[B]are assertions of a pattern of racketeering activity do not establish an enterprise." Doan v. Singh, 617 Fed. Appx. 684, 686 (9th Cir. 2015). Plaintiffs' factual allegations in the CAC adequately describe conduct of an enterprise consisting of "an association-in-fact to own and operate Fox Hollow and divide among themselves money and benefits derived therefrom" with activities connecting Defendants with the enterprise taking place between 1995 and 2001. Doc. 410, CAC, ¶ 167. Each of the Defendants participated and took action on behalf of

the association-in-fact.

280. A "'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). "RICO defines as racketeering activity only acts that are 'indictable' (or, what amounts to the same thing, 'chargeable' or 'punishable') under one of the statutes identified in §1961(1)." RJR Nabisco, Inc. v. European Cmty., 136 S. Ct. 2090, 2102 (2016). Section 1961(1) includes "any act which is indictable under any of the following provisions of title 18, United States Code:… section 1341 (relating to mail fraud), section 1343 (relating to wire fraud)." 18 U.S.C. § 1961(1)(B). Plaintiffs allege multiple acts of mail and wire fraud undertaken by the association-in-fact between 1997 and 2001. Doc. 410, CAC, ¶ 173. Mail fraud is defined as "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both." 18 U.S.C. § 1341. Wire fraud is defined as "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be

transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both." 18 U.S.C. § 1343. "Sections 1341 and 1343 reach any scheme to deprive another of money or property by means of false or fraudulent pretenses, representations, or promises." Carpenter v. United States, 484 U.S. 19, 27 (1987). "[C]auses to be delivered" and "causes to be transmitted" is interpreted broadly. United States v. Garner, 663 F.2d 834, 838 (9th Cir. 1981), citing United States v. Maze, 414 U.S. 395, 399 (1974) ("the government may prove the use of the mails for the purpose of executing a scheme to defraud by showing that a defendant acted knowing that the use of the mails would follow in the ordinary course of business, or that, even when not intended, such use was reasonably foreseeable. In addition, the mailings need not be an essential part of the contemplated scheme, they need only be made for the purpose of executing the scheme"). Plaintiffs have alleged multiple acts of mail and/or wire fraud in connection with their scheme. Each of the Defendants intended to participate in the scheme to defraud the Lenders.

281. These activities affected interstate commerce. "A minimal effect on interstate commerce satisfies this jurisdictional element." United States v. Bagnariol, 665 F.2d 877, 892-93 (9th Cir. 1981) (noting that "interstate telephone calls" could suffice). Plaintiffs specifically alleged that Defendant Richard Sinclair sent a letter via facsimile to Mr. Sessions of GMAC Mortgage in Hawaii on May 5, 1998 providing financial information on Defendant Mauchley in support of the mortgage application. Doc. 410, CAC, ¶ 153.

282. Plaintiffs have stated RICO claims against all the Defaulted Defendants.

**2. Unjust Enrichment**

283. "The elements of unjust enrichment are 'receipt of a benefit and unjust retention of the benefit at the expense of another.' This equitable test does not turn merely on the transfer of money or other benefits from one party to another — it requires injustice."

Berger v. Home Depot USA, Inc., 741 F.3d 1061, 1070 (9th Cir. 2014), citing Lectrodryer v. SeoulBank, 77 Cal. App. 4th 723, 726 (Cal. App. 2d Dist. 2000) and Doe I v. Wal-Mart Stores, Inc., 572 F.3d 677, 684 (9th Cir. 2009). In the CAC, Plaintiffs refer to the general facts alleged and do not specifically state what constitutes unjust enrichment. See Doc. 410, CAC, ¶¶ 182-184. Plaintiffs do not explain what allegations fit an unjust enrichment claim in their motion for default judgment. See Doc. 1203. In their later briefing, Plaintiffs suggest that their unjust enrichment cause of action is based on the failure to return security deposits to tenants in 2002; Plaintiffs noted that the tenants had assigned their rights to Plaintiff CEMG. See Doc. 1226-1, Proposed FOFCOL, ¶¶ 176-183, citing Doc. 410, CAC, ¶¶ 1, 89, 111, 112, 115, 116, 118, 119, 121, and 151. The most pertinent allegations in the CAC state that Defendants "entered in to written leases on units 104, 133 and 135 with tenants and then refused the demands for return of first month's rent and security deposits in the amounts of $1,825, $1,850 and $1,895 respectively which such rights of the tenants have been assigned to Plaintiff CEMG." Doc. 410, CAC, ¶ 116. Plaintiff alleges that Defendants did not actually hold title to these properties at the time they rented them out. Doc. 410, CAC, ¶ 115. If Defendants did not have actual authority to lease out the property, the lease agreements were voidable. See Lafountaine v. Grobstein, 2016 Bankr. LEXIS 2218, *11 n.8 (B.A.P. 9th Cir. June 7, 2016). As Plaintiffs appear to be seeking to enforce the terms of the lease, namely the return of the security deposit, these allegations fail to state a claim for unjust enrichment as it appears there was an agreement which defined the rights of the parties.

284. However, "unjust enrichment is an action in quasi-contract, which does not lie when an enforceable, binding agreement exists defining the rights of the parties." Paracor Fin., Inc. v. GE Capital Corp., 96 F.3d 1151, 1167 (9th Cir. 1996). In the rental context, a lease agreement provides for damages based on breach of contract. See Western Gen. Ins. Co. v. Encino Exec. Plaza, Ltd., 2005 Cal. App. Unpub. LEXIS 3895, *20-21 (Cal. App. 2d Dist. Apr. 29, 2005) ("Landlord fails to explain whether equitable relief is available in this situation. If Tenant had withheld payment of the increased operating costs, Landlord

might have been limited to seeking standard contract damages as opposed to equitable relief"). Based upon CAC's factual allegations that the renters and the Defendants had a written lease agreement, no unjust enrichment claim has been stated.

**3. Constructive Trust**

285. Plaintiff CEMG owns Lots 2, 6, 7, 8, 9, 10, and 18 (on which stand the main residential structures) while there is controversy over who owns the associated garages. Doc. 410, CAC, ¶¶ 120, 121, 123, 124, 125, 126, and 128. Plaintiffs assert in counts five and six that Defendants hold these garages in a constructive trust for CEMG's benefit and seek declaratory and injunctive relief to have ownership over the garages formally transferred. Doc. 410, CAC, ¶¶ 189-202. Federal and California courts have determined that "a constructive trust is an equitable remedy, not a cause of action." Rasmussen v. Dublin Rarities, 2015 U.S. Dist. LEXIS 24260, *36 (N.D. Cal. Jan. 22, 2015); Lawson v. CitiCorp Trust Bank, FSB, 2011 U.S. Dist. LEXIS 86780 (E.D. Cal. Aug. 5, 2011); PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP, 150 Cal. App. 4th 384, 398 (Cal. App. 2d Dist. 2007). The same is true of the request for declaratory and injunctive relief. Plaintiffs have not stated a cause of action for these two counts. The remedy requested is addressed below.

**4. Fox Hollow CC&Rs**

286. Under California law, CC&Rs "shall be enforceable equitable servitudes, unless unreasonable, and shall inure to the benefit of and bind all owners of separate interests in the development. Unless the declaration states otherwise, these servitudes may be enforced by any owner of a separate interest or by the association, or by both." Cal Civ. Code § 5975(a), formerly codified as Cal. Civ. Code § 1354(a) (repealed 2014).

287. "[T]he association shall levy regular and special assessments sufficient to perform its obligations under the governing documents and this act." Cal. Civ. Code § 5600(a), formerly codified as Cal. Civ. Code § 1366(a) (repealed 2014). The Fox Hollow CC&Rs

set out that the HOA would "establish regular monthly assessments for operations and maintenance of the Project…payable in monthly installments on the first day of each month." Doc. 410, CAC, ¶ 49. Plaintiffs allege that Defendants failed to pay the assessments of the Fox Hollow HOA. Doc. 410, CAC, ¶ 212.

288. The Fox Hollow CC&Rs also required Defendant Flake, as trustee of the Julie Insurance Trust, "to convey to the [HOA] fee title to the common area for the Fox Hollow Property free and clear of all liens and encumbrances 'prior to the conveyance of title to the first lot.'" Doc. 410, CAC, ¶ 49. On March 20, 2003, Plaintiff Fox Hollow HOA demanded that Defendants deliver a deed transferring title over the common area to the HOA. Doc. 410, CAC, ¶ 217. Defendants have refused to do so. Doc. 410, CAC, ¶ 218.

289. Plaintiff Fox Hollow HOA has stated a cause of action based on breach of the Fox Hollow CC&Rs.

**B. Eitel Factors**

290. Factors which may be considered by courts in exercising discretion as to the entry of a default judgment include: (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits. Eitel v. McCool, 782 F.2d 1470, 1471–72 (9th Cir. 1986).

291. Regarding the first and sixth factors, default was entered because Defendants Richard Sinclair, Brandon Sinclair, Lairtrust, and Capstones consistently violated court orders and repeatedly refused to fulfill their responsibilities to participate in discovery. Doc. 1070. Defendant Richard Sinclair declared that due to his lack of assets, monetary sanctions could not induce him to obey court orders. Doc. 982. This case was first filed in federal court in 2003. A plaintiff suffers prejudice if they "would be denied the right to judicial resolution of the claims presented, and would be without other recourse for

recovery." Warner Bros. Home Entm't v. Jimenez, 2013 U.S. Dist. LEXIS 97139, *9 (C.D. Cal. July 8, 2013), quoting Electra Entm't Grp. Inc. v. Crawford, 226 F.R.D. 388, 392 (C.D.Cal.2005). Plaintiffs in this case would suffer prejudice if default judgment is not entered. As default was ordered by the court at the end of a series of sanctions, there was no excusable neglect by Plaintiffs.

292. The second and third factors are related and often analyzed together. See DR JKL Ltd. v. HPC IT Educ. Ctr., 749 F. Supp. 2d 1038, 1048 (N.D. Cal. 2010). The discussion above has established that Plaintiffs have sufficiently stated causes of action against the Defaulted Defendants. In examining the merits of the claim, defendants may present evidence but must do so in opposition to the motion for default judgment to be deemed timely. See NewGen, LLC v. Safe Cig, LLC, 840 F.3d 606, 616 n.7 (9th Cir. 2016). In this case, Defendant Richard Sinclair's submissions were untimely submitted and stricken from the record for his failure to appear at the hearing. Doc. 1220. The evidence submitted by Plaintiffs supports the merits of their substantive claims. Defendant Richard Sinclair has raised the concern that Defendant Brandon Sinclair was a minor during at least part of the time period over which the events of this case took place. Defendant Brandon Sinclair's birth date is July 16, 1978. Exhibit 49, Response to Interrogatories Signed by Richard Sinclair, page 3. He turned 18 in 1996, before the main part of the RICO violations occurred. Defendant Brandon Sinclair personally took part in the RICO scheme in 2000. Further, the overall case law on the actions of minors suggests that as long as Defendant Brandon Sinclair took active part in the RICO violations, he can be found financially liable. In a criminal RICO case, the Ninth Circuit stated that "Nothing in the [Juvenile Delinquency Act] or in any other statute suggests that Congress intended to create a loophole resulting in no rehabilitation or punishment whatsoever for persons who indisputably committed a serious continuing crime, merely because the crime happened to span the defendant's eighteenth birthday…. we adopt the prevailing view that, for prosecution of a defendant indicted at age 18, 19, or 20, pre-majority acts may be admitted as substantive proof of a continuing crime such as the substantive RICO count here."

United States v. Camez, 839 F.3d 871, 875-76 (9th Cir. 2016). Looking at related non-RICO law, invites the same conclusion. In one fraud case, parents passed funds through their minor children's account to try to hide the monies during a bankruptcy; the district court found both the parents and the children jointly and severally liable for repaying the bankruptcy estate. Boyer v. Belavilas, 474 F.3d 375, 377 (7th Cir. 2007). The Seventh Circuit modified the judgment, finding the minor persons not personally liable on the basis that "§ 17(c) of the [Uniform Transfers to Minors Act] addresses the problem of lifetime liability arising from events a minor cannot control: 'A minor is not personally liable for an obligation arising from ownership of custodial property or for a tort committed during the custodianship unless the minor is personally at fault.' The children's obligation to return the fraudulent conveyance is one 'arising from ownership of custodial property'. Unless a minor is 'at fault'--and the bankruptcy judge held that neither Angelo nor Nickolas bears any fault--all obligations that relate to the UTMA account must be satisfied either from the custodial assets under § 17(a) or by the custodian." Boyer v. Belavilas, 474 F.3d 375, 378-39 (7th Cir. 2007). In litigation, costs may be taxed against a minor. Petri v. Kestrel Oil & Gas Props., L.P., 2013 U.S. Dist. LEXIS 8695, *20 (S.D. Tex. Jan. 17, 2013). The fact that Brandon Sinclair was a minor until 1996 would not affect this judgment.

293. For the fourth factor, "Default judgment is disfavored when a large amount of money is involved or is unreasonable in light of the defendant's actions." Joe Hand Promotions, Inc. v. Burleson, 2011 U.S. Dist. LEXIS 119191, *9 (E.D. Cal. Oct. 14, 2011). This is a RICO case in which the Defendants are alleged to have undertaken a coordinated scheme of defrauding Lenders and owners of the Lots over multiple years. However, Plaintiffs request over $10 million in damages and "a large amount of money weighs against default judgment." Chong's Produce, Inc. v. Pushpak Rests., Inc., 2017 U.S. Dist. LEXIS 36498, *9 (N.D. Cal. Feb. 27, 2017). This factor weighs against default judgment. However, courts have the authority to reduce the award for default judgment. See Hanover Ins. Co. v. Realty Bancorp Equities, LLC, 2016 U.S. Dist. LEXIS 140831, *9 (C.D. Cal. Oct. 7, 2016); Joe Hand Promotions, Inc. v. Be, 2011 U.S. Dist. LEXIS 124057,

*7 (N.D. Cal. Oct. 26, 2011) ("Where a plaintiff's request for damages is excessive, the court may mitigate the impact of this factor by reducing the amount awarded").

294. The fifth factor is the possibility of dispute concerning material facts. "Because all allegations in a well-pleaded complaint are taken as true after the court clerk enters default judgment, there is no likelihood that any genuine issue of material fact exists." Elektra Entm't Group, Inc. v. Crawford, 226 F.R.D. 388, 393 (C.D. Cal. 2005). This conclusion is further reinforced by the fact that Defaulted Defendants have "submitted nothing to contradict the well-pled allegations." Joe Hand Promotions, Inc. v. Burleson, 2011 U.S. Dist. LEXIS 119191, *10-11 (E.D. Cal. Oct. 14, 2011).

295. The seventh factor is the strong policy that favors decisions on the merits. The factor is not dispositive but must be considered alongside the other factors. Maxum Indem. Co. v. Court Servs., 2012 U.S. Dist. LEXIS 79956, *12 (E.D. Cal. June 8, 2012).

296. On balance, the factors weigh in favor of granting the motion for default judgment. Striking answers to the CAC was a litigation sanction arrived at after a years-long process whereby the court has unsuccessfully tried to make Defendants Richard Sinclair, Brandon Sinclair, Lairtrust, and Capstone comply with court orders. Defendant Richard Sinclair especially has taken multiple opportunities to frustrate the process of this case, preventing it from reaching a conclusion. At this point, default judgment appears to the only way to resolve this case.

**C. Money Damages**

**1. RICO**

297. "Any person injured in his business or property by reason of a violation of section 1962 of this chapter [18 U.S.C. § 1962] may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." 18 U.S.C. § 1964(c). The trebling of civil RICO damages is mandatory. See Allstate Ins. Co. v. Nassiri, 2013 U.S. Dist. LEXIS 98348, *5-6 (D. Nev. July 15, 2013) ("Having reviewed 18 U.S.C. § 1964(c), the court finds that it is

required to treble damages"); Beneficial Standard Life Ins. Co. v. Madariaga, 851 F.2d 271, 277 (9th Cir. 1988) ("the treble damages mandated by RICO"). Section 1964(c) "requires the plaintiff to establish proximate cause in order to show injury 'by reason of' a RICO violation." Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 654 (2008). Civil RICO allows for joint and several liability. See Beneficial Standard Life Ins. Co. v. Madariaga, 851 F.2d 271, 272 (9th Cir. 1988) (noting that the district court issued a judgment finding defendants joint and severally liable); Fleischhauer v. Feltner, 879 F.2d 1290, 1301 (6th Cir. 1989) ("the nature of the RICO offense mandates joint and several liability").

298. As part of the purchase of Lots 3, 7, 9, and 14, Plaintiff CEMG acquired from Conti an assignment of all associated legal and equitable claims. Doc. 1237, Transcript, 33:6-16; Ex. 11, pages 3 and 4. "[F]ederal courts have consistently held that parties may assign RICO claims." HIF Bio, Inc. v. Yung Shin Pharms. Indus. Co., 2006 U.S. Dist. LEXIS 97002, *14 (C.D. Cal. June 9, 2006), citing Lerman v. Joyce Int'l, 10 F.3d 106, 112-13 (3rd Cir. 1993) and In re National Mortg. Equity Corp. Mortg. Pool Certificates Sec. Litigation, 636 F. Supp. 1138, 1156 (C.D. Cal. 1986). For these Lots, Plaintiff CEMG (standing in the shoes of Conti) is the proper party to seek RICO damages. Granite Bay Funding was the original lender on the mortgages secured by first deeds of trust for Lots 3, 7, 9, and 14 in July 1998; Conti acquired those loans from Granite Bay Funding in August 1998. Doc. 410, CAC, ¶ 73. Granite Bay kept the loans for only a month. There is no indication that Granite Bay suffered any financial repercussions due to Defendants' fraud. Defendants concealed the failure to complete the subdivision through November 18, 1999. Doc. 410, CAC, ¶¶ 77 and 85. When Conti sold Lots 3, 7, 9, and 14 to Plaintiff CEMG in 2002, Defendants had already defaulted on the mortgages. Conti sold the loans to Plaintiff CEMG for less than the amount owed. Conti suffered a financial loss of $510,139.65 due to Defendants' actions. Ex. 16. The trebled amount is $1,530,418.95.

299. Plaintiff CEMG claims $292,153.13 in "compliance/rehab costs" for Lots 3, 7, 9, and 14. Ex. 20. Defendant Richard Sinclair objected to this category of damages as much

of the money was spent "to spruce up a 20+ year old building." Doc. 1208, Opposition to Motion for Default Judgment, pages 89-90. At the prove up hearing, Katakis testified that the rehabilitation of those Lots was extensive: "We replaced almost everything inside. When I say everything, I mean everything, from Sheetrock to all flooring, to electrical, all outlets, all cabinetry, all hard surfaces, tile work, all plumbing, all light fixtures, just go on and on. The only things that weren't replaced for the most part were the foundations and studs and Sheetrock. Everything else had to be replaced." Doc. 1237, Transcript, 50:17-23. The report by the architect Fergel, who evaluated what was required for the "Proposed Planned Development (P.D.) zoning to convert existing apartments to duplexes and single units" did not call for redoing the interiors; instead, the report recommended installing firewalls for garages, installing firewalls for certain units, eliminating certain roof overhangs, and checking or adding smoke detectors. Ex. 18. Plaintiffs stated that the rehab "included completing the requirements of the City of Turlock for separate ownership of the lots, **and also** a complete renovation of the exteriors and interiors of many of the units that were no longer habitable." Doc. 401, CAC, ¶ 135, emphasis added. Thus the total figure Plaintiff CEMG requests includes monies expended to make corrections necessary to subdivide Fox Hollow as well as funds spent on other improvements. The evidence presented does not allow for clarifying which expenditures are which. Failing to keep up with general repairs on the individual Lots is not part of Plaintiffs' RICO claim. See Doc. 410, CAC, ¶ 153. Plaintiff CEMG has not provided sufficient evidence to determine how much it spent to complete the changes required to gain approval for subdivision. This request for damages is denied.

300. Plaintiff CEMG has owned 17 of the 19 Fox Hollow Lots (all but Lots 1 and 19) since 2003. Doc. 410, CAC, ¶¶ 120-128. Plaintiff CEMG was prevented from selling the Lots to individual buyers due to Defendants' failure to transfer certain garage spaces to Plaintiff CEMG and the common areas to Plaintiff Fox Hollow HOA. As a consequence, Plaintiff CEMG could not sell their Lots in late 2004, early 2005 when real estate prices were high. Plaintiff CEMG has suffered a loss of $2,353,516.63 due to the delay. Doc.

1237, Transcript, 67:19-25. The trebled amount is $7,060,549.89.

301. Plaintiff Fox Hollow HOA spent $350,110.95 in 2003 and 2004 rehabilitating Fox Hollow. Doc. 1237, Transcript, 80:4-82:7; Exs. 24-25. But as with Plaintiff CEMG, Plaintiff Fox Hollow HOA has not explained how much of the expense was to make changes required to gain approval for subdivision and how much was general improvement. There is insufficient evidence to determine how much was spent to make the necessary changes. This request for damages is denied.

302. Plaintiff Fox Hollow HOA paid Rubenstein, McGranahan, and their attorneys a total of $28,277.28 for their services which lasted from March 2001 to October 2002. Doc. 1237, Transcript, 25:24-26:2; Exs. 4, 5, 6, and 8. Plaintiffs seek to recover sum but have not established how this is a result of Defendants' RICO violations. The receivers took control of the HOA and managed its operations. Plaintiffs have not provided evidence as to how Defendants' fraudulent actions necessitated these fees. This request for damages is denied.

303. Before Plaintiff Fox Hollow HOA was formally incorporated, it paid Defendant Richard Sinclair $15,266.99 in attorney's fees between August 2000 and January 2001. Ex.7, McGranahan Report, page 4, Exs. A and C. Plaintiff Fox Hollow HOA seeks to recover $5,200 of this amount. Doc. 1226-1, Proposed FOFCOL, 41:16-24 and 64:25-65:2. Fraudulently demanding dues on behalf of a nonexistent HOA was part of Defendants' RICO scheme. Lender GMAC paid $5,200 in response to those demands. Ex. 9. In this circumstance, GMAC is the proper party to seek relief rather than Plaintiff Fox Hollow HOA. "To determine whether an injury is 'too remote' to allow recovery under RICO and the antitrust laws, the Court applies the following three-factor 'remoteness' test: (1) whether there are more direct victims of the alleged wrongful conduct who can be counted on to vindicate the law as private attorneys general; (2) whether it will be difficult to ascertain the amount of the plaintiff's damages attributable to defendant's wrongful conduct; and (3) whether the courts will have to adopt complicated rules apportioning damages to obviate the risk of multiple recoveries." Oregon Laborers-Employers Health &

Welfare Trust Fund v. Philip Morris, Inc., 185 F.3d 957, 963 (9th Cir. 1999), citing Holmes v. Securities Investor Protection Corporation, 503 U.S. 258, 269-70 (1992). GMAC is the direct victim; there was no obligation for GMAC to pay as the HOA did not yet exist. This request for damages is denied.

**2. Fox Hollow CC&Rs**

304. Plaintiffs have presented the testimony of Casey Johnson, a certified public accountant who has reviewed the dues, late charges, special assessments, and finance charges of the Fox Hollow HOA. Doc. 1237, Transcript, 85:15-21.

305. Johnson specified that he was testifying to the total amount of HOA dues and charges that Defendants failed to pay, from August 1, 2000 onward. Doc. 1237, Transcript, 86:11-14. As part of their RICO claim, Plaintiffs have specifically asserted that the demand for HOA dues "over the period of August through December 2000" was fraudulent. Doc. 410, CAC, ¶ 173. That is because "Defendants had failed and refused to form Fox Hollow HOA as a non-profit mutual benefit corporation until on or about December 6, 2000." Doc. 410, CAC, ¶ 95. Plaintiffs have consistently asserted that Fox Hollow HOA did not form until that time. See Doc. 1227, Supplemental Briefing ("When Fox Hollow HOA was created in December 2000…"). The theory of the RICO violation is that the non-existence of Fox Hollow HOA before incorporation is what made the demands for HOA dues fraudulent. Thus, Plaintiffs' request for HOA dues or late fees from Defendants based on the time before the Fox Hollow HOA formed is disallowed.

306. Johnson presented Exhibit 47, which contains two alternate summaries of total charges due using simple or compound interest. Johnson also presented Exhibit 48 which laid out who owned the Lots at any given time. Johnson's testimony and the exhibits provide evidence to support a modified award of monetary damages.

307. Johnson concludes, using simple interest, that Capstone owes $40,384.26 due to ownership of Lot 1 and Lairtrust owes $40,384.20 due to ownership of Lot 19. Doc. 1237, Transcript, 93:4-9 and 15-18. Exhibit 48 shows that Johnson's conclusion was based upon

ownership in the February 4, 2002 to March 15, 2004 period. Ex. 48, pages 1 and 19. These amounts do not include any HOA dues from 2000.

308. Johnson concludes that Mauctrst owes $142,318.06 due to ownership of Lots 1, 2, 3, 5, 6, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, and 19. Doc. 1237, Transcript, 93:10-14. However, some of that is based on HOA dues from August-December 2000. Examining Exhibits 47 and 48 reveals that the amounts owed for Lots 1, 2, 5, 11, 15, 17, 18, and 19 are completely based on HOA dues assessed in 2000. These amounts are not recoverable. The exhibits also show that the amounts owed for Lots 3, 6, 8, 9, 10, 12, 13, 14, and 16 are partially based on HOA dues assessed in 2000. The figures provided by Johnson must be modified. Defendants levied a $300 monthly assessment on the first of the month with a 10% penalty for failure to pay by the end of the month. Defendants started levying on August 1, 2000 and Fox Hollow HOA was not formed until December 6, 2000. Thus, the levies for August, September, October, November, and December were invalid, for a total of ($300 + $30) x 5 = $1,650. The amount owed Johnson set out for Lots 3, 6, 8, 9, 10, 12, 13, 14, and 16 must be reduced by $1,650 each. Johnson's analysis also calculated finance charges for nonpayment at a rate of 12% annual interest. His summary broke the finance charges out into three periods running (1) August 1, 2000 to March 1, 2011, (2) March 1, 2011 to November 24, 2014, and (3) November 24, 2014 to May 10, 2016. Ex. 47. This information does not allow the finance charges for the HOA dues from 2000 to be stripped out. Similarly, the figures provided in Johnson's full report does not set out the information in a manner which would allow that sum to be readily calculated. See Ex. 46. Consequently, no finance charges are awarded. Damages for unpaid HOA assessments are set at $7,590 for Lot 3, $3,960 for Lot 6, $1,320 for Lot 8, $8, 550 for Lot 9, $1,320 for Lot 10, $660 for Lot 12, $960 for Lot 13, $8,580 for Lot 14, and $1,155 for Lot 16, which totals $34,095.

**D. Declaratory Relief**

**1.Constructive Trust**

309. Plaintiffs request that the garages associated with Lots 2, 6, 7, 8, 9, 10, and 18 be transferred to CEMG. Doc. 410, CAC, ¶ 193. As part of the RICO claim, Plaintiffs have asserted that Defendants committed fraud by misleading the Lenders who thought the garages were part of the Lots that they provided mortgage loans for; instead the garages "were not included in the legal description in the deed of trust for the loan on each such lot…and were left out as part of the deal between Defendants Richard Sinclair, Mauchley and Flake in 1997." Doc. 410, CAC, ¶¶ 59 and 71. In 2008, Defendant Richard Sinclair, on behalf of Defendants Mauchley and Mauctrst, demanded that Plaintiff CEMG and the tenants of Lots 2, 6, 7, 8, 9, 10, and 18 vacate the garages. Doc. 410, CAC, ¶¶ 142 and 143; Ex. 41. In 2007, Defendant Mauchley quitclaimed his interest in the garages in favor of Defendant Lairtrust. Doc. 410, CAC, ¶ 141.

310. The structure and organization of the Fox Hollow project leads to the natural assumption that the garages, even though physically separated from the corresponding residences, are automatically part of the associated Lots. For example, the Fox Hollow CC&Rs only provided access easements over the common areas "for the benefit of Lots and Lot Owners" with "Lots" defined as "Lots 1-19." Doc. 410, CAC, ¶¶ 47 and 51. If the garage units were to be treated as independent units, their owners would have no easement to access them under the Fox Hollow CC&Rs.

311. "One who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he or she has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it." Cal. Civ. Code § 2224. "To properly allege the remedy of the imposition of a constructive trust, a pleading requires: (1) facts constituting the underlying cause of action, and (2) specific identifiable property to which the defendant has title." Jaffee v. Carryl, 2016 U.S. Dist. LEXIS 83224, *9 (C.D. Cal. June 27, 2016), citing Michaelian v. State Comp. Ins. Fund, 50 Cal. App. 4th 1093, 1114 (Cal. App. 5th Dist. 1996). "A plaintiff seeking imposition of a constructive trust must show: (1) the existence of a res (property or some interest in property); (2) the right to that res; and (3) the

wrongful acquisition or detention of the res by another party who is not entitled to it." Mattel, Inc. v. MGA Entm't, Inc., 616 F.3d 904, 909 (9th Cir. 2010), citing Communist Party v. 522 Valencia, Inc., 41 Cal. Rptr. 2d 618, 623 (Cal. App. 1st Dist. 1995). "Constructive trusts are creatures of equity. In dealing with them, equity will disregard mere form, and will ascertain and act on the substance of things, regarding that as done which should have been done. The determination of whether a particular transaction is unconscionable is not governed by hard and fast rules, but is committed largely to the enlightened conscience of the individual judge, subject to the revisionary action of appellate tribunals." United States v. Pegg, 782 F.2d 1498, 1501 (9th Cir. 1986), quoting 60 Cal. Jur. 3d Trusts § 287 (1980).

312. Plaintiffs have identified the real property at issue. The garages were meant to have been attached to the deeds of trust securing Lots 2, 6, 7, 8, 9, 10, and 18. Defendants have retained an interest in the garages through misrepresentation. A constructive trust is properly imposed on the garages for the benefit of Plaintiff CEMG.

**2. Fox Hollow CC&Rs**

313. Plaintiffs also request that the common areas be transferred to the Fox Hollow HOA. The CAC alleges that Defendants violated the Fox Hollow CC&R by refusing to turn over the common areas. Doc. 410, CAC, ¶¶ 217 and 218.

314. In response, Defendant Richard Sinclair claims that the common areas were "already deeded to Plaintiffs." Doc. 1208, Opposition to Motion for Default Judgment, page 93. However, Plaintiffs have asserted that Defendants continue to claim ownership over those areas. In 2008, Defendant Richard Sinclair, on behalf of Defendant Mauctrst, demanded that Plaintiffs and Fox Hollow tenants stop using the common areas including the driveway. Doc. 410, CAC, ¶ 146; Ex. 40. At the prove up hearing, Katakis specifically testified that Defendant Richard Sinclair had attempted to interfere with Plaintiffs' and their tenants' use of the common area. Doc. 1237, Transcript, 59:12-23.

315. Declaratory relief is needed to affirm that the common areas of the Fox Hollow

project properly belong to the HOA per the Fox Hollow CC&R.

**VI. Order**

316. Default judgment is granted in favor of Plaintiffs CEMG and Fox Hollow HOA against the Defaulted Defendants for civil RICO and in favor of Plaintiff Fox Hollow HOA against the Defaulted Defendants for breach of the Fox Hollow CC&Rs.

317. Defaulted Defendants' RICO violations caused Conti $510,139.65 in damages and Plaintiff CEMG of $2,353,516.63 in damages. Conti has assigned its rights to Plaintiff CEMG. Treble damages apply. Plaintiff CEMG would be awarded $8,590,968.84 against the Defaulted Defendants, jointly and severally.

318. The settlement with Defendant Mauchley and the Flake Defendants has yielded $460,000 and $2,297,793 respectively in funds available to satisfy this judgment. The total sum of $2,757,793shall be used to offset the RICO award. Thus, the amount awarded to Plaintiff CEMG against the Defaulted Defendants is reduced to $5,833,175.84.

319. Defendants Capstone, Lairtrust, and Mauctrst violated the Fox Hollow CC&Rs by failing to pay HOA dues. Plaintiff Fox Hollow HOA is awarded $40,384.26 against Capstone, $40,384.20 against Lairtrust, and $34,095 against Mauctrst.

320. Defaulted Defendants' fraudulent conduct resulted in a cloud over the title of certain garage lots. Plaintiff CEMG is entitled to and owns and holds the right to possession of Lots 2A, 6A, 7A, 8A, 9A, 10A and 18A of the Fox Hollow property according to Fox Hollow, a subdivision, recorded in the Official Records of Stanislaus County, California, on March 6, 1996, in Book 37 of Maps, Page 37, and Fox Hollow No. 2, a subdivision, recorded in the Official Records of Stanislaus County, California, on July 21, 1998, in Book 38 of Maps, Page 19 (the "detached garage lots") as of the commencement of the action in April 2003, and such Defaulted Defendants and each of them have no ownership of or right to exclude Plaintiffs or any of the tenants at Fox Hollow from any such detached garage lots. Defendants Richard Sinclair, Mauctrst, and Lairtrust, and each of them, and their agents, servants, and employees, and all other

persons acting under, in concert with or for them, are permanently enjoined from asserting, claiming or communicating to tenants at the Fox Hollow property (located at 152 20th Century Boulevard, Turlock, Stanislaus County, California) that they or any of them hold or claim any ownership or right to possession for the detached garage lots or otherwise from interfering with the use and enjoyment of any of the detached garage lots by Plaintiffs and the tenants at the Fox Hollow property.

321. Defaulted Defendants' fraudulent conduct resulted in a cloud over the title of the common areas. Plaintiff Fox Hollow HOA is entitled to ownership in and the right to possession of the Common Area and Access Easement and Public Utility Easement depicted on Fox Hollow No. 2 subdivision map filed of record in Stanislaus County, California, on July 21, 1998, in Book 38, Page 19 (the "Fox Hollow Common Area") as of the commencement of the action in April 2003, and such Defaulted Defendants and each of them have no ownership of or right to exclude Plaintiffs or any of the tenants at Fox Hollow from the Fox Hollow Common Area. Defendants Richard Sinclair and Mauctrst, and each of them, and their agents, servants, and employees, and all other persons acting under, in concert with or for them, are permanently enjoined from asserting, claiming or communicating to tenants at Fox Hollow that they or any of them hold or claim any ownership or right to possession for the Fox Hollow Common Area or otherwise from interfering with the use and enjoyment of the Fox Hollow Common Area by Plaintiffs and the tenants at the Fox Hollow property.

322. Plaintiffs may file a motion for attorney's fees and cost bill in accord with Local Rules 292 and 293.

323. The remainder of this action is dismissed in its entirety with prejudice.

IT IS SO ORDERED.

Dated: March 31, 2017

SENIOR DISTRICT JUDGE